Edward Lee CLEMMONS,
Plaintiff–Appellant,

v.

Dale BOHANNON, Robert Tansy, Herb Maschner, and Robert Mills,
Defendants–Appellees.

No. 88–2730.

United States Court of Appeals,
Tenth Circuit.

Feb. 14, 1992.

David J. Gottlieb, University of Kansas School of Law, Lawrence, Kan., for plaintiff-appellant.

Martha M. Snyder, Asst. Atty. Gen. (Robert T. Stephan, Atty. Gen., with her on the brief), Topeka, Kan., for defendants-appellees.

Before McKAY, Chief Judge, and HOLLOWAY, LOGAN, SEYMOUR, MOORE, ANDERSON, TACHA, BALDOCK, BRORBY, and EBEL, Circuit Judges.

## ON PETITION FOR REHEARING EN BANC

TACHA, Circuit Judge.

This appeal arises from a suit brought by pro se plaintiff Edward Clemmons. Clemmons, a nonsmoking inmate at the Kansas State Penitentiary in Lansing, Kansas, sued officials of the Kansas Department of Correction under 42 U.S.C. § 1983, alleging violations of the Eighth and Fourteenth Amendments arising out of his involuntary subjection to environmental tobacco smoke (ETS). Clemmons contends that his subjection to smoking cellmates in a shared cell has led to significant involuntary exposure to ETS and that this exposure amounts to deliberate indifference to his health in vio-

lation of the Eighth Amendment, and of his Fourteenth Amendment right to substantive due process.

The district court granted summary judgment in favor of the officials of the Kansas Department of Corrections. A three-member panel of this court reversed the district court in *Clemmons v. Bohannon*, 918 F.2d 858 (10th Cir.1990) [*Clemmons I*]. We now vacate our decision in *Clemmons I* and affirm the district court.

In spite of our concern that exposure to ETS is a potential health hazard, we cannot agree that exposure to ETS rises to the level of an Eighth Amendment violation in this case because the record reveals absolutely no evidence that Clemmons's health has been adversely affected by the cigarette smoke produced by his cellmate. Further, Clemmons has utterly failed to demonstrate a factual dispute regarding the defendants' deliberate indifference to serious medical needs. Therefore, we conclude that Clemmons has failed to satisfy Rule 56 of the Federal Rules of Civil Procedure in opposing the defendants' motion for summary judgment.

## I.

■ We review summary judgment orders de novo, using the same standards the district court applies. *Osgood v. State Farm Mut. Auto. Ins. Co.*, 848 F.2d 141, 143 (10th Cir.1988). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In determining whether there is an issue of material fact, we view all facts and draw all inferences from the facts in favor of the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

■ To oppose a motion for summary judgment, a nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The rule requires the nonmoving party "to come forward with 'specific facts showing that there is a *genuine issue for trial.'* " *Id.* at 587, 106 S.Ct. at 1356 (quoting Rule 56(e) and adding emphasis). A genuine issue exists when the nonmoving party presents sufficient evidence for a jury to return a verdict in his favor. *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968).

## II.

■ The Eighth Amendment, applicable to the states by virtue of the Fourteenth Amendment, *Robinson v. California*, 370 U.S. 660, 662, 82 S.Ct. 1417, 1418, 8 L.Ed.2d 758 (1962), prohibits the infliction of "cruel and unusual punishment" on individuals convicted of crimes. The phrase "cruel and unusual punishment" today prohibits punishment that, "although not physically barbarous, 'involves the unnecessary and wanton infliction of pain.' " *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)). The Supreme Court, in *Estelle v. Gamble*, 429 U.S. 97, 105, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976), "conclude[d] that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment."

In *Wilson v. Seiter*, —— U.S. ——, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991), the Supreme Court recently reaffirmed that a prisoner claiming that his conditions of confinement constitute unnecessary and wanton infliction of pain must show "deliberate indifference" to "serious medical needs." Thus, the inquiry regarding an alleged Eighth Amendment violation contains two parts: an objective component asking whether the deprivation was suffi-

ciently serious *and* a subjective component asking whether the officials acted with a sufficiently culpable state of mind. *Id.* 111 S.Ct. at 2324.

■ Moreover, allegations of "inadvertent failure to provide adequate medical care" or "negligent diagnosis," the Court explained in *Wilson,* do not establish an Eighth Amendment violation because an intent requirement is implicit in the word "punishment." *Id.* 111 S.Ct. at 2325, 2328. Thus, to survive the summary judgment motion and proceed to trial, Clemmons must present specific facts that would allow a reasonable fact finder to conclude that he had a serious medical need *and* that the defendants were deliberately indifferent to that need.

### III.

■ Turning to the first issue—a serious medical need—Clemmons submitted his own affidavit and affidavits of Daryl Brown, Louis Conger, Carl Johnson, Fredrick Cameron, Thurman Mitchell, Christopher Union, Howard Taylor, Samuel Arnold, Darryl Noloms, Rodney Sanders, and Michael Colbert. Clemmons's affidavit states he has been "exposed to inhaling carcinogens from the tobacco of inmates who smoke in my immediate breathing space at Kansas State Penitentiary." The other affidavits, except for those of Cameron and Sanders, establish that the affiants were celled with Clemmons sometime between January 1986 and May 1987 and are smokers or smoked during the time they celled with him. Cameron's affidavit states that he was a nonsmoker when he celled with Clemmons in January 1987. Sanders's affidavit states that he is a nonsmoker who requested a nonsmoking cell and was moved into Clemmons's cell sometime prior to November 1987.

Clemmons's signed and sworn complaint asserts that he is a nonsmoker and that he "continue[s] to suffer the affects [sic] [of] hazardous tobacco smoke ... exhaled by other inmates in [his] immediate breathing environment inside his cell." His complaint also establishes that he was celled by himself in segregation for some period of time.

Clemmons further states he has had "physical problems and medical problems as a result of ... inhal[ing] carcinogens from the tobacco of inmates who smoke tobacco" on a "daily basis" and expose him to "toxic smoke fumes" and "stress." Clemmons alleges that he "suffers shortness of breath." Clemmons's pro se brief opposing summary judgment, signed but not sworn, states that his "throat, eyes and nose" were irritated by tobacco smoke and that this irritation required repeated medical care.

Even if Clemmons has presented sufficient facts in his affidavits and complaint linking his respiratory and eye irritation to the ETS in his cell, these symptoms alone do not compare to the medical needs that courts have found sufficiently serious to constitute an Eighth Amendment violation. *See, e.g., Dace v. Solem,* 858 F.2d 385, 386–88 (8th Cir.1988) (painful nasal deformity requiring surgery and head injury from being struck with a lead pipe may be sufficiently serious); *Payne v. Lynaugh,* 843 F.2d 177, 178–79 (5th Cir.1988) (severe emphysema requiring oxygen equipment sufficiently serious); *French v. Owens,* 777 F.2d 1250 (7th Cir.1985) (gross medical deficiencies in prison resulting in undiagnosed tuberculosis, untreated broken back, and unattended abscessed rectum sufficiently serious), *cert. denied,* 479 U.S. 817, 107 S.Ct. 77, 93 L.Ed.2d 32 (1986); *Aldridge v. Montgomery,* 753 F.2d 970, 972 (11th Cir. 1985) (deep, heavily bleeding eye injury requiring stitches sufficiently serious); *Mullen v. Smith,* 738 F.2d 317, 318 (8th Cir. 1984) (injuries to back and head from fall causing continuous and severe pain for months and preventing inmate from walking may be sufficiently serious); *Fields v. Gander,* 734 F.2d 1313, 1314–15 (8th Cir. 1984) (severely infected tooth and swollen face may be sufficiently serious); *Ramos v. Lamm,* 639 F.2d 559, 575–78 (10th Cir. 1980) (systematic and gross deficiencies in medical, psychiatric, and dental care sufficiently serious), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Spain v. Procunier,* 600 F.2d 189, 199 (9th Cir.1979) (total denial of outside exercise

and fresh air sufficiently serious); *West v. Keve*, 571 F.2d 158, 160–62 (3d Cir.1978) (chronic venous stasis and severe varicose veins in leg and posiosteal thickenings, all requiring surgery, may be sufficiently serious).

Besides the manifest symptoms of respiratory and eye irritation, however, Clemmons claims his exposure to ETS may lead to more serious carcinogenic effects. The evidence Clemmons presents regarding carcinogenic effects consists of a flyer from the American Lung Association of Kansas describing the noxious ingredients of cigarette smoke, a news article mentioning the U.S. Surgeon General's finding that "some carcinogens are released from the tip of the burning cigarette in concentrations higher than those inhaled by active smokers," and an article relating the General Services Administration's change in policy to favor nonsmokers in government facilities. However, Clemmons does not offer any evidence that shows effects pertaining to *his* personal health besides a sore throat and runny eyes and nose.

■ In an attempt to conjure up a factual dispute, the dissent speculates that Clemmons "could be forced to live indefinitely in a small cell with a heavy smoker." This blind prognostication cannot save Clemmons's action from dismissal. The Eighth Amendment does not sweep so broadly as to include possible latent harms to health. This court previously has held that the "core areas" of any Eighth Amendment claim are shelter, sanitation, food, personal safety, medical care, and adequate clothing. *Ramos*, 639 F.2d at 566 & n. 8; *see Rhodes*, 452 U.S. at 347, 101 S.Ct. at 2399 (conditions of confinement in *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) and *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), violated Eighth Amendment because of serious deprivations of basic necessities of life); *Inmates of Occoquan v. Barry*, 844 F.2d 828, 836–39 (D.C.Cir.1988) ("deprivations" that trigger Eighth Amendment scrutiny are deprivations of essential human needs—food, shelter, health care, and personal safety).

Clemmons's complaint that he is sometimes forced to share a cell with a smoker does not implicate any of these core Eighth Amendment areas, *see Ramos*, 639 F.2d at 566 & n. 8, nor does exposure to ETS "deprive [Clemmons] of the minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347, 101 S.Ct. at 2399; *Inmates of Occoquan*, 844 F.2d at 836–39.

■ If Clemmons's claim colorably touches the most peripheral edge of a core Eighth Amendment area, it would be the area of adequate medical/health care. The deliberate indifference standard for medical care requires that the inmate's illness or injury be a *serious* one. *Estelle*, 429 U.S. at 104–05, 97 S.Ct. at 291. For example, the following types of injuries were found to be sufficiently serious: four knife stab wounds, *Reed v. Dunham*, 893 F.2d 285 (10th Cir.1990); broken bones rendering limbs useless or the plaintiff unconscious, *Mandel v. Doe*, 888 F.2d 783 (11th Cir.1989) (cracked hipball joint); *Brown v. Hughes*, 894 F.2d 1533 (11th Cir.) (broken foot), *cert. denied*, —— U.S. ——, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); *Simpson v. Hines*, 903 F.2d 400 (5th Cir.1990) (neck trauma); symptoms of a heart attack, *Miltier v. Beorn*, 896 F.2d 848 (4th Cir.1990) (chest pains, shortness of breath, dizziness); or chronic illness, *White v. Napoleon*, 897 F.2d 103 (3d Cir.1990) (epilepsy); *Greason v. Kemp*, 891 F.2d 829 (11th Cir. 1990) (schizophrenic with suicidal tendencies).

Neither the Supreme Court nor this court has ever held that a potential, distant harm to a prisoner's health is a serious medical need. Clemmons does not have a *serious medical need;* he has alleged *no* adverse physical symptoms from cigarette smoke different from those suffered by everyone in society. "[C]onditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional" even if those conditions are sometimes "restrictive and even harsh." *Rhodes*, 452 U.S. at 347, 101 S.Ct. at 2399. Clemmons's complaint regarding ETS is simply of a lesser magnitude than those cases that have found an Eighth Amendment violation

due to deliberate indifference to serious medical need.

## IV.

Even if we concede that exposure to ETS can have serious medical consequences, the allegation of exposure in a penitentiary setting, without more, is not enough to satisfy the subjective component of cruel and unusual punishment. If plaintiff had shown or even alleged that defendants forced him to live with others who smoked and that they did so intentionally, knowing the smoke would have serious medical consequences for him, a different result might obtain. Indeed, constant confinement under those conditions could be patently cruel. Yet, defendants consistently made a reasonable effort to accommodate plaintiff's needs consistent with the conditions found in the institution.

Plaintiff's desire was to be housed by himself. When he made this demand, he was advised that the overcrowded conditions would not permit single celling, however, if he could find another inmate who did not smoke, the institution would cell them together. Plaintiff himself admits this accommodation was made, and the district court found that at the time summary judgment was granted, plaintiff was celled with a nonsmoker. We believe this effort at reasonable accommodation satisfies any responsibility the defendants had to remove plaintiff from the irritants caused by ETS. In this regard, we also note plaintiff not only objected to being celled with persons who smoked, but he also objected to ETS from prison staff members. We simply do not believe the defendants could have made a more reasonable accommodation than that which they extended.[1]

To successfully oppose the motion for summary judgment, Clemmons was required to present facts that would allow a reasonable fact finder to conclude that the defendants knew of the dangers of ETS and deliberately exposed him to it. In his affidavit, Clemmons alleges that the defendants exhibited "reckless disregard and deliberate indifference in their failure and refusal to permit me to cell in a single cell as a means to avoid being exposed to inhaling carcinogens." He also claims he has "made every attempt available ... to seek a *single* cell" (emphasis added.) In his complaint, Clemmons asserts the defendants refused or failed to take action because of "deliberate indifference and reckless disregard." He claims the defendants "refused to permit the plaintiff to live in a single cell" and the "double cell assignments are ... cruel and unusual punishment." Besides these general allegations and legal conclusions, Clemmons offers *no specific facts* showing the defendants' deliberate intent to expose him to carcinogens.

Although the defendants concede they did not authorize Clemmons to a *single cell*, Clemmons himself admits the defendants approved his cell assignment with a nonsmoking inmate as early as February 6, 1986—one week after Clemmons says he first was exposed to ETS and only a few

---

1. The dissent suggests that there is no evidence in the record that the defendants made a reasonable effort to accommodate plaintiff. However, when Clemmons complained about a cellmate who smoked, he was told to find a nonsmoker and they would be paired. The record indicated on several occasions that this was done. The record also demonstrates that, at least in one instance, Clemmons did not respond to this suggestion.

The dissent also suggests that the record is devoid of evidence that it would be "administratively inconvenient" to house nonsmokers together. Clemmons never contended that all nonsmokers should be communized. There simply was no reason to introduce such evidence.

Moreover, in more than one instance, Clemmons claimed that his health was not only impaired by his cellmate's smoking, but also by the smoking of members of the "team." This claim demonstrates that Clemmons seeks not only a cell to himself, but also a smoke-free environment in which communizing nonsmokers would not be satisfactory unless those inmates also were supervised by a nonsmoking staff.

Thus, unless we are prepared to conclude that the only accommodation that would satisfy Clemmons's needs is to remove him to a smoke-free environment, there is nothing in the record to suggest that the defendants did not respond to each of Clemmons's demands to the full extent available to them, given the conditions within the institution. We reach no such conclusion under these circumstances.

days after he asked prison officials for help in registering a complaint. Clemmons admits the record shows that as early as February 17, 1986, prison officials recommended he "find [a] nonsmoker to cell with." He concedes prison officials told him they did not know "who smokes or doesn't." Finally, he admits the defendants celled him with nonsmokers part of the time.

Clemmons asserts in his appellate brief that medical personnel at the prison knew he suffered from ETS exposure and failed to take appropriate action. This assertion, however, is not supported by the record. Clemmons admits he was "consistently prescribed medications" when he notified medical personnel of his problems. Affidavits of Ky Hoang, M.D., and Sharon Wright, R.N., show that when Clemmons complained of shortness of breath and chest pains, Hoang examined him and found his lungs clear and his breathing normal. Hoang also stated that he did not believe ETS had imperiled Clemmons's health. Clemmons presents no competent evidence showing prison medical personnel were convinced that the cause of his problems was ETS exposure requiring a non-smoking cell. Because Clemmons has not shown deliberate indifference and the Eighth Amendment does not apply to claims based on inadvertent failure to provide adequate care, negligent misdiagnosis, or an inmate's difference of opinion with medical personnel regarding diagnosis or treatment, *Wilson*, 111 S.Ct. at 2324; *Estelle*, 429 U.S. at 107–08, 97 S.Ct. at 293; *Ramos*, 639 F.2d at 575, summary judgment for the defendants is proper.

Clemmons has not provided specific evidence showing that the defendants' intent in making cell assignments was to disregard a serious medical need of Clemmons. Further, it is unlikely the defendants could have been deliberately indifferent regarding ETS exposure in prison cells during 1986 and 1987 based on the state of knowledge about ETS at that time. In light of Clemmons's admissions, we cannot infer from the single fact that Clemmons had smoking cellmates that the prison officials deliberately intended to expose Clemmons to carcinogens. The Supreme Court has used the "deliberate indifference" language to describe the Eighth Amendment standard of "unnecessary and wanton infliction of pain." *See Estelle*, 429 U.S. at 105, 97 S.Ct. at 291–92. Even adopting all of Clemmons's unsupported assertions regarding the defendants' actions, we cannot conclude that those actions fall within the purview of unnecessary and wanton infliction of pain. By asserting that Clemmons's claim of exposure to ETS raises a fact issue as to the defendants' deliberate indifference, the dissent ignores—or at least disregards—both the Eighth Amendment's "cruel and unusual punishment" language and also the "unnecessary and wanton infliction of pain" standard from which the deliberate indifference standard is derived.

V.

The role of this Court is not to spearhead and define society's evolving standard of decency. Rather, this Court must interpret and apply the Constitution of the United States. When the dissent attempts to create new standards of decency based on reports by the Environmental Protection Agency and the Surgeon General, it ceases to interpret the Constitution. Instead of applying constitutional standards, the dissent's reasoning mandates a public health ideal for all of society. *See Rhodes*, 452 U.S. at 351, 101 S.Ct. at 2401 ("In assessing claims that conditions of confinement are cruel and unusual, courts must bear in mind that their inquiries 'spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility.'") (quoting *Bell v. Wolfish*, 441 U.S. 520, 539, 99 S.Ct. 1861, 1874, 60 L.Ed.2d 447 (1979)). Under the circumstances of this case, our role should be more limited: we should only decide whether Clemmons was subjected to cruel and unusual punishment when he was celled with a smoking prisoner. We find that he was not.

Our opinion in *Clemmons I* is VACATED and the district court is AFFIRMED.

SEYMOUR, Circuit Judge, dissenting.

Because I must respectfully disagree with the majority, I dissent. This case presents two straightforward issues. Can this court say as a matter of law that significant exposure to ETS does not present a serious risk of harm. If we cannot, can we then say as a matter of law that defendants have not been deliberately indifferent to that serious risk. Unfortunately, the majority's treatment of these issues is not straightforward, therefore providing little guidance on these critical issues to the lower courts and prison officials.

The majority opinion appears to hold that exposure to ETS only states a claim if a plaintiff can show that he presently suffers from its adverse effects. The majority then holds that because defendants treated Clemmons's present symptoms, they have not been deliberately indifferent. However, this case is not about a sore throat, a runny nose, or red eyes: it is about cancer.

Alternatively, the majority grudgingly assumes that even if the potential for developing cancer may rise to a constitutionally cognizable claim, defendants have not been deliberately indifferent to that risk because they have given Clemmons a nonsmoking cellmate from time to time. In its zeal to uphold the summary judgment for defendants on this meager record, the majority disregards compelling evidence, of which we may take judicial notice, that exposure to ETS does indeed pose a serious health risk. Furthermore, in dealing with the issue of deliberate indifference, the majority makes an argument on behalf of defendants which defendants have never made, and bolsters that argument by making factfindings on a summary judgment which are not supported by the record. Such cavalier treatment is disturbing when we are deciding under what circumstances a prisoner who has not been sentenced to death can be exposed to a substance which an agency of our own government has proposed to classify as a known human carcinogen.

Turning first to the health risks posed by exposure to ETS, I note that Clemmons is sentenced to spend virtually all of his life in prison, and that under current prison policy he could be forced to live indefinitely with a smoking cellmate. The majority's dismissal of this situation as "blind prognostication," maj. op. at 1528, is puzzling when defendants have consistently asserted that they have *no obligation* to provide Clemmons a nonsmoking cellmate and have only occasionally done so in the past. Given the potential here for exposure to a heavy concentration of ETS over a long period of time, the mounting scientific evidence of the potentially lethal effects of long-term exposure to ETS creates a fact issue as to whether this exposure constitutes a health hazard at least as constitutionally significant as other conditions (*i.e.,* inadequate ventilation, exercise, or diet) that have been held to constitute cruel and unusual punishment.

The applicable modern Eighth Amendment principles are now familiar. The Cruel and Unusual Punishments Clause proscribes punishments "which, although not physically barbarous, 'involve the unnecessary and wanton infliction of pain'; or are grossly disproportionate to the severity of the crime. Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'" *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981) (citations omitted). A prisoner's conditions of confinement may constitute punishment prohibited by the Eighth Amendment unless such conditions are "'part of the penalty that criminal offenders pay for their offenses against society.'" *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (quoting *Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399). Any Eighth Amendment analysis of whether prison conditions are cruel and unusual punishment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion); *see also Thompson v. Oklahoma,* 487 U.S. 815, 108 S.Ct. 2687, 2691, 101 L.Ed.2d 702 (1988) (plurality opinion); *Pen-*

*ry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 2953, 106 L.Ed.2d 256 (1989).

In *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court first held that prison officials' deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment. In *Hutto v. Finney,* 437 U.S. 678, 687, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978), the Court affirmed a district court's holding that denial of an inmate's basic human needs is "cruel and unusual." These decisions arise from an essential fact of prison life: the prisoner depends totally on the state to secure those necessities fundamental to his or her very existence. An incarcerated person loses more than freedom. The prisoner must depend on the state to make the most basic decisions vital to his or her health and safety. The Eighth Amendment, as now construed, requires that the state act humanely in making these decisions on its wards' behalf. *See Estelle,* 429 U.S. at 104, 97 S.Ct. at 291 (" '[i]t is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself' ") (quoting *Spicer v. Williamson,* 191 N.C. 487, 490, 132 S.E. 291 (1926)). *See also Battle v. Anderson,* 564 F.2d 388, 395 (10th Cir.1977) ("Persons are sent to prison as punishment, not *for* punishment").

Courts have applied this general principle in a variety of situations relating to the maintenance of an inmate's physical well being. *See, e.g., Caldwell v. Miller,* 790 F.2d 589, 600 (7th Cir.1986) (prolonged restriction on exercise that threatens an inmate's physical health); *Hoptowit v. Spellman,* 753 F.2d 779, 783–84 (9th Cir.1985) (lack of adequate ventilation and air flow, inadequate cell-cleaning supplies, vermin infestation, poor lighting); *Jones v. Diamond,* 636 F.2d 1364, 1374 (5th Cir.) (en banc) (gross overcrowding, filthy mattresses, extreme heat, poor diet, lack of exercise), *cert. dismissed,* 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981), *overruled in part on other grounds, International Woodworkers v. Champion Int'l Corp.,* 790 F.2d 1174, 1175 (5th Cir.1986); *Ruiz v. Estelle,* 679 F.2d 1115, 1152 (5th Cir.1982) (inadequate regular exercise), *vacated in part on other grounds,* 688 F.2d 266, (5th Cir.1982) *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983); *Spain v. Procunier,* 600 F.2d 189, 199–200 (9th Cir. 1979) (denial of regular outdoor exercise for period of years); *Miller v. Carson,* 563 F.2d 741, 751 n. 12 (5th Cir.1977) (deprivation of exercise). These decisions all reflect the same well-settled principle: the state is under a constitutional mandate to take reasonable steps to provide a safe and sanitary environment for those incarcerated. *See generally* J. Gobert & N. Cohen, *Rights of Prisoners* §§ 11.10, 11.14–.15, 11.17 (1981 & 1989 Cum.Supp.); *cf. Ramos v. Lamm,* 639 F.2d 559, 568 (10th Cir.1980) (state must provide inmate with a " 'healthy habilitative environment' ") (quoting *Battle,* 564 F.2d at 395), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981).

My conclusion that there is an issue of fact regarding whether ETS exposure constitutes a constitutionally significant health hazard is supported by a recent external review draft issued by the Environmental Protection Agency on the health effects of ETS. *See Health Effects of Passive Smoking; Assessment of Lung Cancer in Adults and Respiratory Disorders in Children; External Review Draft,* 55 Fed. Reg. 25,874 (1990). This report

"concludes that (1) ETS is causally associated with lung cancer in nonsmoking adults and that, according to EPA guidelines for carcinogen risk assessment, ETS is a Group A (known human) carcinogen; and (2) that approximately 3800 lung cancer deaths per year among nonsmokers (neversmoker and former smokers) of both sexes in the United States are attributable to ETS."

*Id.* Group A is made up of known human carcinogens including arsenic, asbestos, benzene, chromium compounds, coke oven emissions, diethylstilbestrol (DES), and vinyl chloride. *See* Environmental Protection Agency, *Methodology for Evaluating Potential Carcinogenicity in Support of Reportable Quantity Adjustments Pursu-*

*ant to CERCLA Section 102,* app. at 37–42 (1988).[1]

The majority views any reliance on this evidence as an improper attempt "to create new standards of decency." Maj. op. at 1529. The majority simply misperceives the issue. As we have pointed out, the benchmarks of our inquiry must be the "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles,* 356 U.S. at 101, 78 S.Ct. at 598. Moreover, the extensive line of cases we have cited culminating in *Wilson v. Seiter,* —— U.S. ——, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), recognizes that unnecessarily subjecting a prisoner to conditions posing an unreasonable risk of harm does indeed offend these evolving standards. As our technology advances, some risks previously viewed as innocuous may be recognized as rising to constitutional significance. Surely the majority would not deny that as scientific awareness of potential harms evolves, our standards of decency evolve as well.

The relevant question in this case, therefore, is whether long-term exposure to ETS poses an unreasonable risk of harm to an inmate's health. Our task on appeal is to review the correctness of the district court's conclusion that it is *beyond doubt* that Clemmons can prove no set of facts in support of his claim which would entitle him to relief. *See* rec., vol. I, doc. 23, at 5. Since judges are not and cannot be experts in this area, we must do here what we normally do in such circumstances, turn to evidence from experts. Taking judicial no-

tice[2] of expert evidence in the form of reports by a federal agency and the Surgeon General does not constitute an improper attempt to foist my views on society; turning a blind eye to such evidence would appear more susceptible to such a charge.

I am most troubled by the majority's apparent conclusion that the Eighth Amendment does not include claims based on latent harms to health. *See* maj. op. at 1528, 1529. Under this holding, defendants could continue to expose a prisoner to asbestos or any other known human carcinogen until that prisoner falls ill. Thus, for those prisoners subjected to substances which result in cumulative harm that does not manifest itself for a considerable period of time, the protection afforded by the Constitution is meaningless. Surely the Eighth Amendment does not require a claimant to wait until the risk to his health results in disease if that risk is known and can be prevented. *See, e.g., Powell v. Lennon,* 914 F.2d 1459, 1464 & n. 10 (11th Cir.1990) (Eighth Amendment claim grounded on deliberate indifference to plaintiff's request for preventive treatment in seeking placement in asbestos-free environment). Equally disturbing is the majority's conclusion that our evaluation of the serious risk of harm and of the concomitant deliberate indifference standard imposed on defendants was frozen at the time Clemmons filed his suit. *See* maj. op. at 1529. To the contrary, evolving standards of decency by their very nature require that courts impose upon defendants a *continu-*

---

**1.** I note in addition the Surgeon General 1986 Report setting out the scientific evidence concerning the harmful effects of ETS. In that report, the Surgeon General stated:

"[T]he time for delay is past; measures to protect the public health are required now. The scientific case against involuntary smoking as a health risk is *more than sufficient* to justify appropriate remedial action, and the goal of any remedial action must be to protect the nonsmoker from environmental tobacco smoke."

1986 Report at xii (emphasis added).

**2.** *See* Fed.R.Evid. 201 (court may take judicial notice of adjudicative facts in absence of request of party at any stage of the proceeding). In this case, for purposes of determining whether

Clemmons raises fact issues sufficient to survive summary judgment, I have taken judicial notice of government reports referred to or incorporated into the Congressional Record. Although some of this information was not noticed by the district court, appellate courts may notice facts not noticed below. *See* Advisory Committee's Notes to Fed.R.Evid. 201(f); *Mills v. Denver Tramway Corp.,* 155 F.2d 808, 812 (10th Cir. 1946) (appellate court has discretion to take judicial notice of facts not called to the attention of the trial court); E. Cleary, *McCormick on Evidence* § 333 (3d ed.1984). We may also take notice of official government publications, *see Clappier v. Flynn,* 605 F.2d 519, 535 (10th Cir. 1979).

*ing duty* to apprise themselves of conditions that pose a serious risk of harm and to adjust their conduct accordingly.

I must also disagree with the majority's statement that, as a matter of law, defendants could not have done more than they did to minimize Clemmons' exposure to ETS. Maj. op. at 1528. The majority begins by erroneously stating that, in order to prevail in this appeal, the plaintiff would have to show or allege "that defendants forced him to live with others who smoked and that they did so *intentionally*, knowing the smoke would have serious medical consequences for him." Maj. op. at 1528 (emphasis added). The Court in *Wilson* held specifically to the contrary, rejecting as too high the state of mind under which acts must be done " 'for the very purpose of causing harm,' " *Wilson*, 111 S.Ct. at 2326. In so doing, the Court distinguished and did not apply *Whitley v. Albers*, 475 U.S. 312, 320–21, 106 S.Ct. 1078, 1084–85, 89 L.Ed.2d 251 (1986), under which an Eighth Amendment claim arising from an emergency situation requires that the defendant act " 'maliciously and sadistically for the very purpose of causing harm.' " As the cases cited by the Court in *Wilson* make clear, *arbitrarily* refusing to protect an inmate from a known risk of serious harm can constitute deliberate indifference

notwithstanding the absence of proof of an intent to cause the harm. *See, e.g., La-Faut v. Smith*, 834 F.2d 389, 392 n. 4 (4th Cir.1987) (claimant need only show that the defendant was deliberately indifferent to his needs, not that she affirmatively intended to deprive him of the means of satisfying his needs").[3]

Second, the majority reaches its result by asserting that defendants have made reasonable attempts to reduce Clemmons' exposure to ETS, an argument defendants do not themselves make. Rather, defendants have consistently contended that exposure to ETS does not pose a serious risk to health and that they therefore have *no obligation* to minimize Clemmons' exposure to it. Indeed, virtually all of defendants' brief on rehearing is devoted to an attempt to show that ETS does not, as a matter of law, pose a serious risk of harm. To the extent defendants appear to acknowledge any risk of harm, they erroneously contend, as does the majority, that Clemmons must show an intent to cause that harm.

Finally, the majority asserts that it "simply [does] not believe the defendants could have made a more reasonable accommodation than that which they extended." Maj. op. at 1528. Because this appeal comes to us on the grant of summary judgment,

---

**3.** A recent Seventh Circuit decision rejected a prisoner's claim that his involuntary exposure to ETS constituted cruel and unusual punishment. *See Steading v. Thompson*, 941 F.2d 498 (7th Cir.1991). Although the basis for its decision is unclear, the court in *Steading* rests its result in part on its observation that ETS is commonly found in public places and that the prison officials themselves breathe smoky air. In addition to disregarding the fact that bans on smoking in public areas are increasing in response to the mounting evidence of health risks, the court also ignores the critical distinction between the public at large and a prison inmate. It would hardly seem necessary to point out that while the public is free to avoid smoky restaurants and offices, a prisoner confined with a smoking cellmate has no choice in the matter. Moreover, the fact that people who are free to do so choose to expose themselves to serious health risks cannot justify the arbitrary, involuntary exposure of a prisoner to those risks. It would be absurd to suggest that because people ride with drunk drivers, practice bungee jumping, sky-dive, and ride motorcycles without helmets,

a prison official could therefore require an inmate to do so over his objection. The court's reference to the intent of the drafters of the Eighth Amendment likewise requires no comment other than to point out that the touchstones of this area of the law are "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion). Most troublesome is *Steading's* apparent conclusion that the deliberate indifference standard articulated in *Wilson*, 111 S.Ct. at 2326–27, requires an intent to punish. The court in *Steading* states that if prison officials "do not *intend* [a prisoner's] *discomfiture* they have not punished him, and so do not violate the cruel and unusual punishment clause as *Wilson* interprets that amendment." 941 F.2d at 500 (emphasis added). As we have pointed out above, however, the Court in *Wilson* held specifically to the contrary, rejecting as too high the state of mind under which acts must be done " 'for the very purpose of causing harm.' " *Wilson*, 111 S.Ct. at 2326.

such a factfinding against the non-moving party must be established by undisputed evidence. However, defendants indisputably have *not minimized* Clemmons' exposure to ETS. Most importantly, they offered *no* evidence tending to show a legitimate administrative reason for this failure. While overcrowding might justify a refusal to give Clemmons a single cell, nothing in this record indicates that it would be administratively inconvenient for defendants to cell nonsmokers together upon request.[4] Although defendants have upon occasion given Clemmons a nonsmoking cellmate for a short period of time, they have also, without explanation, given him smoking cellmates for the great majority of the time.[5] Moreover, and most significantly, they take the position that they are entitled to continue to do so at their discretion. The majority's result can certainly be read as a tacit approval of this position.

Accordingly, lower courts and prison officials are left to wonder. Does the Eighth Amendment require only that long-term exposure to ETS be treated with cough drops and nasal sprays. Is it enough, as the majority implies, maj. op. at 1528, that prison officials provide a nonsmoking cellmate when a prisoner goes to court, or on other occasions at their discretion, which is all the record demonstrates was done here.

Given the potential risk of harm at stake, the deliberate indifferent standard demands that defendants at a minimum be required to articulate real and legitimate administrative considerations to justify their celling policy. Unfortunately, perhaps the only clear message conveyed by the majority opinion is that in this circuit officials need not do so.

McKAY, C.J., and HOLLOWAY, J., join this dissent.

---

4. In this regard, I find it significant that in federal prisons officials are required, to the extent practicable, to

> "accommodate nonsmoking inmates in non-smoking living quarters. The sharing of a cell or living area between a smoker and a non-smoker will be avoided except where impractical due to circumstances, and then may be done only for limited duration."

28 C.F.R. § 551.162(b) (1991). The mandate under which federal prison officials must operate undercuts the majority's conclusion as a matter of law that defendants here could not do more than they have to minimize Clemmons's exposure to ETS.

5. Clemmons, in a multitude of written requests and letters to corrections officials, has repeatedly requested either a single cell or a nonsmoking cellmate. His single-cell requests were denied because of lack of space. The responses to his requests for a nonsmoking cellmate were more varied. On one occasion, his request was approved but he was thereafter assigned with a smoker. On other occasions, he was told his

request would "be considered." *See* rec., vol. I, doc. 22, ex. 4, at 1. In response to yet other requests, he was told that since prison officials had "no way of knowing who smokes or doesn't," *id.* at 7, he should "find a nonsmoker and let [them] know," *see id.* at 4. On some occasions, Clemmons would reply that he was unable to find such a person, while at other times he would submit a list of nonsmoking inmates. Neither reply appears to have made a difference.

When Clemmons asked at one point to remain cellmates with a nonsmoker because he "desire[d] to protect [their] health from exposure to tobacco smoke in [their] cell breathing space where [they] live," *id.* at 9, his request was denied for unexplained reasons. *Id.* Clemmons attached letters recommending minimizing his ETS exposure written by the prison physician and his assistant to yet another written request for a nonsmoking cellmate. He was told that if he found an "appropriate" nonsmoker, they could be moved together. The upshot of this exchange is not evident in the record.