Joseph **CONIGLIO**, et al., Plaintiffs,

v.

Dale **THOMAS**, et al., Defendants.

No. 82 Civ. 7954 (GLG).

United States District Court,
S.D. New York.

April 6, 1987.

**410**

Lynn E. Busath, James S. Goddard, Davis, Polk & Wardwell, New York City, for plaintiffs.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City by Stephen A. Dvorkin, Asst. U.S. Atty., for defendants.

MEMORANDUM DECISION

GOETTEL, District Judge:

The plaintiffs in this class action are the inmates of the Special Housing Unit ("SHU") of the Metropolitan Correctional Center ("MCC"), a federal penal facility located on Park Row in lower Manhattan. The MCC houses various types of prisoners, primarily pretrial detainees from the district courts in the New York metropolitan area, but also convicted prisoners or those writted in from state facilities. The SHU at the MCC houses inmates placed in disciplinary segregation or administrative detention, as well as inmates requiring special protection. The plaintiffs allege that fire safety conditions in the MCC's SHU are unduly hazardous and, therefore, violate their constitutional rights.

*Background*

The MCC is a twelve-story, high-rise building. It has two wings, one north and one south, which extend outward from a central core. Prisoners at the MCC are housed on the fifth, seventh, ninth, and eleventh floors. Each wing on these floors comprises a "housing unit," which is composed of a central common area, referred to as the "multipurpose area," and three sets of cell blocks, referred to by MCC staff as "pods," branching off from the multipurpose area. Each "pod" has two tiers, with eight, individually-locked cells on each level. Each tier of a pod is called a "range." The pods connect with the common area in a split-level type of arrangement, *i.e.*, a short flight of stairs leads up or down one-half level from the multipurpose area to each range.

The physical structure of the MCC is basically fire resistant. Each cell is separated from others by masonry block walls four inches thick. The floors and ceilings of the cells are made of concrete from four to sixteen and one-half inches thick. The walls, floors, and ceilings of the multipurpose areas are similarly made of concrete blocks and columns, with the exception of ventilation duct openings, doors, windows, and radiator panels. No fire originating in

a cell has ever burned through a wall, floor, or ceiling.

Smoke, however, is a major concern in prison fires, and is responsible for more injuries than burns.[1] In October 1982, fires in the SHU resulted in injuries from smoke inhalation to the prisoners in whose cells the fires were started and, on at least one occasion, to a prisoner in a cell across from the one in which the fire began.

Until recently, the only mechanical means of detecting smoke at the MCC has been smoke sensors located on the fourth floor in the ventilation ducts of the MCC's heating, ventilation, and air conditioning system ("HVAC"). These sensors have been ineffective for a number of reasons, which can best be understood by briefly describing how the HVAC system functions.

Ventilation in the MCC is provided by vertical ducts that extend from the fourth floor mechanical area to the twelfth floor of the facility. Large fans are located near an air-mixing zone on the fourth floor. These fans draw air from all floors in a vertical "stack" through vents near the ceiling of the multipurpose areas, and the floor of each cell. The air then passes through ducts located in the walls themselves. Each vertical line of cells is served by a separate return duct. Once drawn past the return fan and into the airmixing zone, the return air may be mixed with return air from other floors, and with a quantity of fresh air drawn from outside the institution. After being heated or cooled, it is then resupplied to the housing units through supply ducts rising from the fourth floor. These ducts deliver the freshly-conditioned air through supply vents located near the ceiling in the walls of each cell, and in each common area.

Theoretically, smoke from a fire in a housing unit at the MCC would pass into the HVAC system, be drawn down to the fourth floor, and trigger the smoke sensors. However, this does not always occur. The air velocities in the ducts can impede sensor activation. Moreover, the fourth floor smoke detectors are often far from the origin of a fire, so that, by the time the smoke reaches the detectors, it is diluted and "cold," and may not trigger the sensors. In addition, blockage of an exhaust vent in a cell would prevent smoke in that cell from reaching and triggering the smoke alarm sensors.[2]

Fires have occurred at the MCC during which the fourth floor smoke detectors never activated. The fires in the SHU in October 1982, and three fires in other parts of the MCC in 1983, were visually discovered by inmates and correctional officers before the smoke detection system alerted anyone to the problem. Even when activated, the smoke sensors identify only the "stack" of cells involved, not the room, unit, or floor from which smoke originated.[3]

All prisons present a particular fire safety dilemma, since, to one degree or another, their occupants' movements are restricted. High-rise prisons, such as the MCC, present an additional element of danger. In a one or two-story jail, a prisoner may be separated from safety outside by one or two locked doors and only a short distance. In a high-rise facility, prisoners' safe evacuation may be impeded not only by greater distances to exits, but also by elevators, multiple flights of stairs, and additional locked doors.

Persons detained in segregated housing areas, such as the SHU, are in the greatest danger in case of fire because their movements are considerably more restricted than that of other inmates. Inmates in the SHU are usually locked in their cells twen-

---

**1.** Even limited exposure to smoke can hamper rescue efforts by injuring rescuers. In light of this, breathing apparatuses are supplied to assist correctional officers in their duties in the event of fire.

**2.** Occasionally, both supply and return vents are blocked by paper, tin foil, or other items. Such obstructions are removed by the staff when discovered.

**3.** A system of lights on a panel in the MCC's first floor "control room" alerts the correctional staff when the sensors are activated. But, as noted in the text, this only indicates the vertical line of cells in which the problem is located.

ty-three hours a day unless visiting with attorneys or attending court. Moreover, since prison fires are frequently set by inmates in segregated housing areas, other prisoners in those areas are endangered by being in closer proximity to the source of many fires.

The SHU at the MCC comprises one of the three pods on the south wing of the ninth floor ("9–S"). The two tiers of the SHU pod are designated as the "L" and "M" ranges. As previously noted, each tier, or range, contains eight cells, for a total of sixteen cells in the SHU pod. The tiers measure approximately thirty-two feet from the exterior wall of the MCC to the multipurpose area. Elevators and three exit stairwells are located in the central core area. The sole path of exit from each range is through the multipurpose area toward the core.

The MCC has a written fire evacuation plan which, admittedly, has ambiguities and deficiencies. In the event of a fire involving 9–S, the MCC fire evacuation plan calls for SHU and other 9–S inmates to be moved laterally, through the core area, to the ninth floor's north wing ("9–N").[4] Neither the SHU nor the other 9–S cells are equipped with remote unlocking devices. Consequently, in order to evacuate all the SHU inmates to 9–N, it is necessary to release eighteen separate, manual-ly-locked doors using at least two different keys.[5] If a fire occurs between 11:00 p.m. and 6:00 a.m., when all 9–S inmates are locked in their cells, it would be necessary to release at least fifty separate manually-locked doors using at least three different keys. Evacuation during this time period would be further impeded because only one correctional officer is stationed on 9–S during the "morning watch," midnight to 8:00 a.m.[6]

At the inception of this action, the key to the SHU cells was kept in the MCC's ground floor control room during the morning watch,[7] a fact that protracted the period necessary for evacuation of the SHU cells in the event of an emergency, and was a major item of plaintiffs' complaint in this action. The key to the SHU cells is now maintained on the ninth floor at all times, thus alleviating at least some of the danger perceived by the plaintiffs.

The Bureau of Prisons attempts to comply with the provisions of the Life Safety Code ("LSC"),[8] as well as with local building codes and fire ordinances. In many respects, however, the MCC fails to meet LSC standards.[9] Nor is it in full compliance with the New York City Building Code that was in effect at the time the MCC was built,[10] or the current New York State Uniform Fire Prevention and Building Code.[11] Both of these codes allow for

---

**4.** On several occasions, however, this route has not been followed.

**5.** One key is needed to enter each range of cells. The cells must then be opened individually with a different key. Yet another key would be needed to gain access to the core area to get across the ninth floor to the north wing.

**6.** At 6:00 a.m., however, a second officer comes on the floor to prepare for serving breakfast.

**7.** For security purposes, a single officer does not usually maintain possession of multiple keys. Prior to this lawsuit the correctional officer on 9–S for the morning watch had the key to the SHU ranges, but not the individual cells.

**8.** The LSC is a model code developed by the National Fire Protection Association, which specifies standards for fire protection features and construction for buildings. The code represents a consensus view of experts in the field for the purpose of establishing minimum require-

ments that will provide a reasonable degree of safety from fire in buildings.

**9.** For example, the MCC fails to comply with the LSC's requirement of smoke detectors in sleeping areas, adequate fire dampers in vertical ducts, and fire-rated doors.

**10.** The New York City Building Code in effect at the time the MCC was built prohibited any detention facility of the MCC's construction type from exceeding seven stories or seventy-five feet in height, even if that facility was fully-sprinklered. N.Y.C.Administrative Code §§ C26–406.1, Table 4–2, C26–504.1(a) (1975). The MCC is over 100 feet high and has no sprinkler system.

**11.** Under the current New York State Uniform Fire Prevention and Building Code, a multistory building over seventy feet in height must be provided with a coordinated fire protection system, 9 N.Y.C.R.R. § 774.9 (1984), including (1) a

variances based on compensating safety features, and, in some respects, the MCC would qualify for variances where nonconformities exist. However, as a branch of the federal government, the Bureau of Prisons and, hence, the MCC, is not required to comply with the LSC or local New York building codes.

After this action was initiated, the MCC's administrators replaced all of the MCC's polyurethane foam core mattresses with fire-retardant mattresses, featuring a fire-retardant outer covering and a fire-retardant, boric acid-treated cotton fill. Since the mattress is the single biggest flammable item in a cell, replacement of the mattresses previously in use with fire-retardant mattresses has significantly reduced the likelihood of a serious fire in the SHU or on 9–S.

Institution regulations also seek to limit the amount of personal property that inmates may accumulate in their cells. The wooden desks and stools presently in use in some 9–S cells are scheduled to be replaced with metal desks and stools. The MCC's administrators have ordered metal lockers for SHU cells. Once these lockers arrive and are installed (which is expected to be within the year), inmates will be required to store their books and papers in them when those items are not actually being used.

In addition, a fixed video camera has been installed at the end of each of the SHU's two tiers. The doors of all sixteen SHU cells, but not the cells themselves, are within the field-of-vision of these cameras. The images transmitted by the cameras can be monitored by the correctional officer stationed in the MCC's third floor control room. Open intercoms have been installed on each of the SHU's two tiers. The system's microphones are always on, and the transmissions (like the video images transmitted by the fixed cameras) can be monitored in the third floor control room. A call for assistance emanating from the

SHU's most remote cell can be heard in the control room, through the intercom system.

No effective smoke barriers currently exist between the cells, or between the north and south wings of the MCC. The walls separating the housing units from the central core of the building could become effective smoke barriers upon completion of modifications to doors and ducts that are currently being implemented. The MCC has also recently installed area-type smoke detectors on the ceiling of the L and M range corridors in the SHU. However, no smoke detectors have been installed in individual SHU cells. An automatic sprinkler system would substantially increase the safety of the building, but it would be quite expensive (in excess of a million dollars) to install.

*Discussion*

■ Pursuant to the fifth amendment of the United States Constitution, plaintiff class members who are pretrial detainees may not be punished without due process of law. *See Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 1871, 60 L.Ed.2d 447 (1979). A lack of adequate and reliable fire protection can constitute punishment. Any person lawfully confined is entitled to safe conditions of confinement. *See Youngberg v. Romeo,* 457 U.S. 307, 315, 102 S.Ct. 2452, 2457, 73 L.Ed.2d 28 (1982).

■ Although the fifth amendment proscribes the imposition upon pretrial detainees of conditions that work a genuine hardship, or justify the inference of punitive intent, *see Bell v. Wolfish, supra,* 441 U.S. at 539, 542, 99 S.Ct. 1874, 1875, fire safety conditions that are "adequate," and do not subject detainees to a constant, imminent risk of death or injury, cannot be said to offend that standard. *See Fischer v. Winter,* 564 F.Supp. 281, 300 (N.D.Cal.1983).

■ Plaintiff class members who are convicted inmates "may be punished, although that punishment may not be 'cruel and unusual' under the Eighth Amendment." *Bell v. Wolfish, supra,* 441 U.S. at

fire alarm or fire and smoke-detecting system; (2) a full sprinkler system; (3) a standpipe system; (4) emergency elevator controls; (5) recirculating fan controls; (6) a fire control panel;

(7) an exit stairway door unlocking system; and (8) instructional signs for use of exits. *Id.* at § 1061.1.

535 n. 16, 99 S.Ct. at 1871 n. 16. The plaintiff class is entitled to adequate food, clothing, shelter, sanitation, medical care, and personal safety. *See Wolfish v. Levi,* 573 F.2d 118, 125 (2d Cir.1978), *rev'd on other grounds sub nom. Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 20 L.Ed.2d 447 (1979). As one aspect of adequate shelter and personal safety, "[p]risoners have the right not to be subjected to the unreasonable threat of death or injury by fire...." *Hoptowit v. Spellman,* 753 F.2d 779, 784 (9th Cir.1985). *See French v. Owens,* 777 F.2d 1250, 1257 (7th Cir.1985), *cert. denied,* — U.S. —, 107 S.Ct. 77, 93 L.Ed.2d 37 (1986); *Santana v. Collazo,* 714 F.2d 1172, 1183 (1st Cir.1983), *cert. denied,* 466 U.S. 974, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984); *Ruiz v. Estelle,* 679 F.2d 1115, 1153 (5th Cir.), *modified,* 688 F.2d 266 (1982) (per curiam), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983); *Battle v. Anderson,* 564 F.2d 388, 395 (10th Cir. 1977). However, "not every deviation from *ideally safe* conditions constitutes a violation of the constitution...." *Santana v. Collazo, supra,* 714 F.2d at 1183 (emphasis added).

■ Unless objective assessment of prison conditions compels the conclusion that inmates are being subjected to unreasonable safety risks, the federal courts must avoid becoming enmeshed in the minutiae of prison operations, and should decline to second-guess prison administrators in the operation of correctional facilities. *See Bell v. Wolfish, supra,* 441 U.S. at 562, 99 S.Ct. at 1886, *Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974); *Ruiz v. Estelle, supra,* 679 F.2d at 1126.

Since the institution of this action, the level of safety at the MCC has been substantially increased. This has been due in part to this litigation, but in even greater part to a prison-wide study made by the Gage-Babcock Company at the Bureau of Prisons' request following the tragic Danbury prison fire. These improvements have substantially reduced the extent to which judicial interference is warranted.

There is no bright line separating an unreasonable danger from a reasonable one. Had this Court the authority to do so, we would err on the side of caution. However, we appear to have no greater control over our own federal jail than we have over state prisons, so the degree of relief that we can now afford to the plaintiff class is limited.

■ A sprinkler system would be desirable for the MCC. However, it constitutes a substantial expense. Even the LSC standards do not necessarily require sprinkler systems. Moreover, a sprinkler system is activated by heat, not smoke. Because of the limited amount of flammable materials in SHU cells, insufficient heat would be generated to trigger a sprinkler system unless the fire was intentionally contrived. Under these circumstances, we do not believe that the Constitution mandates a direction that such a system be installed.

■ However, additional fire safety improvements are necessary to provide minimum fire safety for the plaintiff class as required by the Constitution. These are (1) smoke barriers, and (2) a system of effective smoke management. The smoke barrier being installed by the defendants between 9–S and 9–N should be completed as soon as possible. In creating this smoke barrier, the defendants are also directed to use wired glass for all windows. An effective system of smoke management could be attained by putting smoke detectors in each cell in the SHU.[12]

Judgment will enter accordingly.

SO ORDERED.

---

12. Although the area smoke detectors already installed in the SHU corridors are of some value, the expert testimony made clear that only detectors within each cell will provide an adequate system of smoke management.