**Kenneth BAKER, et al., Plaintiffs,**

**v.**

**Tamara HOLDEN, et al., Defendants.**

**Civ. No. 86–C–361G.**

United States District Court,
D. Utah, C.D.

March 20, 1992.

Brian M. Barnard, Utah Legal Clinic, Stephen Russell, Michael K. Mohrman, Richards, Brandt, Miller & Nelson, Salt Lake City, Kenneth L. Baker, Draper, Utah, for plaintiffs.

Paul Van Dam, Atty. Gen., Allan Larson, Craig L. Barlow, Kent Barry, Salt Lake City, Utah, for defendants.

### MEMORANDUM DECISION AND ORDER

J. THOMAS GREENE, District Judge.

These consolidated cases [1] are before the court on defendants' Motion to Vacate Preliminary Injunctions maintaining the status quo and prohibiting the lodging of two inmates in one cell, referred to herein as "double celling" or "double bunking," in B, B North, C and D blocks within the Was-

1. *Humphries v. Deland,* 89–C–517A and *Baker v. Deland,* 86–C–361G. Since the present Warden at the Utah State Prison is Ms. Tamara Holden, her name is substituted for former Warden DeLand in the caption.

atch Unit of the Utah State Prison (USP) at Draper, Utah. These injunctions have been in effect since 1986 in the case of blocks B and C, and since 1988 as to blocks D and B North. A trial was held before the magistrate judge on August 6–10, 1990, and on September 24–25, 1990, following a period of extensive discovery and pre-trial proceedings. Thereafter, on March 18, 1991, an injunction was entered continuing the status quo until the Report and Recommendation of the magistrate judge could be presented and resolved. An extensive Report and Recommendation by the magistrate judge was rendered on October 25, 1991 (R & R). Defendants filed Objections to the Report and Recommendation, and although plaintiffs did not object they filed a Motion for Additional Findings. A further hearing was held on November 19, 1991, and on December 11, 1991, the magistrate judge issued a supplemental Report and Recommendation (Supp R & R). Thereafter defendants' motion to vacate the preliminary injunctions was renewed, and plaintiffs filed a response thereto on January 23, 1992. The matter was argued extensively to this court on February 5, 1992.

This court reviews Reports and Recommendations of the magistrate judge under references pursuant to 28 U.S.C. § 636(b)(1)(B) de novo. Accordingly, the court has reviewed the record in this case and on February 11, 1992, conducted a personal inspection of the Wasatch facility at the Utah State Prison.

### FACTUAL BACKGROUND

The Wasatch Unit was constructed in the 1950s and is the oldest of three USP facilities at Southpoint, Draper, Utah. The cells were designed for single inmate occupancy. Wasatch Unit is a medium security facility, composed of inmates classified as medium offenders. In prior litigation in the 1970s state officials entered into a consent decree which obligated them to avoid double bunking.[2] That consent decree is not at issue herein, but the Utah Department of Corrections (UDC) officials have planned to dou-

ble bunk B, B North, C and D blocks since 1986. Those plans were being implemented when the first injunction was issued in 1986. Since then some court approved double bunking was carried out on the first tier of B block and the second tier of C block, and for a very brief period of time on D block. At the present time only one cell on C block, second tier, remains double bunked. Block A is not involved in this litigation.

An extensive recitation of the factual background of this case is set forth in the magistrate judge's Report and Recommendation of October 25, 1991, which includes a summary of evidence presented at the trial and proposed findings of fact. Among other things, the magistrate judge found:

### Plans for Double Bunking

The Utah Department of Corrections (UDC) has had plans to increase the inmate population of the Wasatch Unit since 1986. The proposal includes double celling inmates in cell blocks C, D, B, and B North of the Wasatch Unit. The double celling plan is intended to "alleviate crowding problems at the prison and to allow some antiquated space to be vacated." R & R at 40.

The magistrate judge determined that plaintiffs carried their burden of proof at the trial against defendant UDC officials as to the mental requirement of "deliberate indifference" in connection with plans for double celling:

The defendants admitted that it has been the UDC's intent since 1986 to double cell the Wasatch unit. The defendants have installed additional bunks in various blocks to accomplish their plans. They began to double bunk cell blocks within the Wasatch unit without regard to conditions until plaintiffs and others brought suit to halt the practice. Further, the defendants were aware of the fact that some areas of the Wasatch unit, if double bunked, may be in violation of constitutional standards. Defendant, DeLand, in his letter to Craig Barlow, the Gover-

---

**2.** *Balderas v. Matheson*, 75–C–220.

nor's agent expressly stated 'We are going to be in a crisis situation for at least the next year and a half ...' The letter further states 'Indeed it will be fortunate if this overcrowding does not lead to litigation *which will be tough to defend.*' (Emphasis added). DeLand stated he would not 'feel comfortable running medium security double bunked at these levels as a permanent solution, given the design problems and limitations that we must deal with.' Thus, since 1986 the State of Utah has known it has serious overcrowding problems with its prison system.

R & R at 56.

*Cell Size*

The cell size varies in each of the blocks at the Wasatch Unit. In B North block, for example, the cells are 44 square feet, of which 24 square feet are unencumbered. If double celled, there would be 12 square feet of unencumbered space per inmate. In B block, cells are 53 to 54 square feet leaving 34 square feet of unencumbered space for a single inmate, and 17 square feet per inmate if double celled. In C block, second tier, cells are 84 square feet, and 71 feet excluding the toilet, sink and shower, leaving approximately 30 square feet per occupant if double celled. The cells in D block are 53 square feet, of which 22 feet are unencumbered space. If double celled two inmates would share 31 square feet. On the third tier of C block the cells are 51 square feet. R & R at 41.

The American Correctional Association (ACA) and recommend 35 square feet of unencumbered space per inmate. The American Public Health Association (APHA) call for 60 square feet per inmate of cell space if the cell is to be occupied ten or more hours a day. R & R at 41.

*Cleanliness*

The cell areas and corridors are generally clean, and "there is no serious or even significant problem with mice or vermin" at the Wasatch Unit. R & R at 44.

*Food—Kitchen Facilities*

The magistrate found the kitchen and dining facilities were such that "double bunking will not intrude significantly on food storage facilities or the quality or quantity of inmate food ...," and that "the kitchen facilities are adequate to absorb added inmate population." R & R at 46.

*Shower Facilities*

With regard to shower facilities on C block second tier, B North, and D blocks the magistrate found them "limited, but adequate." The shower facilities on B block were found to be "completely inadequate" so as to prevent double celling of any kind. R & R at 47.

*Impact of More Inmates*

The magistrate judge found that double bunking would add approximately 240 inmates and that such population increase "would not only reduce space available to inmates in cells, but would increase demands on central facilities such as the library, gymnasium, kitchen, laundry and cell block inmate employment." R & R at 43.

The magistrate concluded: "A one hundred per cent increase in inmate population of the Wasatch unit would constitute deliberate indifference to the inmate population safety and health without compensating limitations and structural aid staff improvements. It would constitute overcrowding to the degree of wanton infliction of less than minimal conditions of confinement." R & R at 48.

*Inmate Tension*

The magistrate found that inmate tension in the Wasatch Unit is currently minimal, and that the "risk of violence and aggression is not as great as in the past." Moreover, that "[t]he correctional staff have found no significant increase in aggression and violence with double celling in other parts of the prison with inmates whose classification is not aggressive." R & R at 44.

*Staff*

The magistrate determined that increased staff would be necessitated by double bunking:

If double bunking were implemented the number of staff would have to be increased for inmate safety from violence

and fire, as well as assuring minimal services. No double bunked cell area should be without at a minimum of two staff at night to attend to safety and other inmate problems, with some possible exception for a smaller unit.

R & R at 48.

*Fire Safety*

The magistrate judge was particularly concerned about fire safety in the event of double bunking in B North and the third tier of C block:

Fire safety is a matter of substantial concern. Until this litigation, fire exits and corridors were not marked or were inadequately marked. Fire danger and exit facilities are inadequate in the Wasatch unit because of the old construction of the unit. The problem is acute with regard to the third tier area of C block and also with regard to B North.

R & R at 45.

*Inmate Employment*

At the time of trial about forty percent of the inmates of Wasatch Unit were unemployed. The magistrate expressed concern about the impact of double bunking in connection with anticipated increase of unemployment and inmate idleness, but found that "it can be anticipated there will be an increase in the number of idle inmates but not necessarily a significant increase in the percentage of idle inmates." R & R at 43.

*Inmate Programs*

The magistrate noted that the Wasatch Unit offers a variety of programs for inmates including rehabilitation programs for alcohol and drug treatment, bible study courses as well as courses offering college and high school credit. "[C]rafts, hobbies, and unstructured activities are available as well as a marginal library.... Although the programs are not sufficient to eliminate inmate idleness they are substantial and can aid in reducing inmate boredom and tension. However, programs are not fully equal to inmate demand and an increased population will strain already thin resources." R & R at 43.

*Health Concerns*

General concern was expressed about transmission of disease, but the magistrate found that

there is no evidence of a significant threat from respiratory disease or the transmission of communicable diseases in the current inmate population. Medical staff are aware of the problems and have studied it and concluded there is no serious threat to inmates' health. Current overall inmate health is good and no more respiratory disease is present than in a comparable adult population.

R & R at 46.

*Laundry Facilities*

The magistrate noted that laundry facilities are marginal and "will be strained with increased inmate population," but that "the current laundry equipment can handle some increased demand." "[T]he handling of the medical laundry," however, "is unsatisfactory and must be corrected to prevent problems." R & R at 46–47.

*Ventilation*

The magistrate found that the ventilation system is "marginal and uneven because of age and maintenance problems" and that "more staff attention to ventilation standards" would be in order if double bunking were undertaken, but that "ventilation would be generally adequate except for the third tier C block." R & R at 47.

*Conditions at C Block–Third Tier and B–North*

The magistrate determined that double bunking of some blocks or tiers could be undertaken, but that "[d]ouble bunking of the third tier of C block and B North would be wanton and indifferent to general inmates' needs. Defendants recognize the limited suitability of these areas." R & R at 48.

The magistrate expressed particular concern for the general conditions on C block third tier and B–North block. "As to C block, third tier, added inmates presence would further complicate the inadequate conditions in general on that section.... ventilation would be generally adequate except for the third tier C block." R & R at 47.

With regard to the area of B–North the magistrate found that it "has only corridor space and no area for recreational activities. Inmates have to leave the block for most recreational activities. The area of the third tier of C block has no suitable space for recreational, dayroom, or other alternative uses." R & R at 42.

Additionally, the magistrate noted that B–North and the third tier of C block have the smallest cells. As to B–North, he said:

[T]he size of B North is such that if two inmates were housed in a cell on that block, each inmate would have no more than 12 sq. feet of unencumbered space obviously, and some additional encumbrance for clothing and personal items would occur from the double celling. The cell space on B North is such that if two inmates were housed together the living conditions would be painful, the circumstances wanton, and that action one of deliberate indifference to the inmates' health and safety. The other problems on B North of no alternative recreational space, fire safety concerns such as the manner of egress from the block, and poor ventilation and inadequate showers are added factors that support the conclusion that double celling of B North would constitute cruel and unusual punishment.

R & R at 63–64.

The magistrate came to the same conclusion with regard to C block, third tier:

The area has no guard or full time staff. The cell area is only 50 sq. feet of space and that is not fully unencumbered. If double celled, inmates would have only 15 to 17 feet of space.... Showers and ventilation are inadequate. The only access to the lower area is a stairway down to the main tier C block. This is a very substantial fire hazard. The housing of two inmates in a cell in both B North and third tier of C block exceeds all reasonable intended capacity. Cell size is very small for a single inmate.

R & R at 64.

*C Block—Second Tier*

C block, second tier is an excellent facility. "[E]ach cell has its own toilet, sink and shower. There is adjacent dayroom space and access to other activities is adequate.... The cell space, at least for a single inmate, meets ACA standards." R & R at 65.

*D Block*

As a result of recent remodelling, D block has its own dayroom area. Shower facilities and the ventilation system are adequate. Additionally, the block is well served by support facilities. The magistrate found, "[c]areful classification and selection of inmates to be double celled could limit violence and aggression among inmates.... The bottom two tiers of D block could be double celled and management and other problems adequately controlled." R & R at 65–66.

*B Block*

The magistrate determined that B block could be double celled to the same extent as D block if there were remodeling similar to that done on D block. R & R at 66.

*Areas Where Double Bunking Should Not Be Permitted*

The magistrate found that double bunking on the third tier of C block and block B North should be prohibited:

[T]he circumstances of double celling on the third tier of C block and B North would violate the Eighth Amendment and should be prohibited. C block, second tier and D block may be double celled except for the third tier of D block.

With regard to the first two tiers of B block the magistrate determined that they "may be double celled but not without substantial modifications as to some aspects of the structure and operation of the block, including increased staff around the clock." R & R at 68.

*Improvements Since Report and Recommendations of the Magistrate*

In his original Report and Recommendation dated October 25, 1991, the magistrate judge noted that improvements and renovations had been made in D block, but found that the dayroom or common area was only

on the first tier of D block. At the second hearing before the magistrate judge on November 19, 1991, the record was clarified to reflect the current status of D block. At that hearing it was established that on D block there are now three common areas of about 110 square feet, one on each tier, created by the removal of two cells at one end of each tier. In this same area on each tier an additional two cells have been removed providing three additional showers, making a total of four showers on each tier. Based on evidence presented, the magistrate found that: "The same construction (accomplished at D block) has been or will be done on B block." Supp. R & R at 2.

Notwithstanding these improvements, the magistrate concluded in his second Report and Recommendation dated December 11, 1991 that there should be no change in the prior recommendation that the third tiers of D and B blocks should not be double bunked, because "[t]he common area is still substandard as to space per inmate housed on the tier under the calculations of needed space per inmate user for common areas as testified to by plaintiffs' expert." Supp. R & R at 2. The magistrate said that while such expert testimony was as to a correctional standard and does not establish any constitutional requirement, "it is some evidence of human need." *Id.* at 2 n. 1. It was noted that although the new construction would remove eight inmates from blocks D and B, "double celling of the third tier of each block would add more than eight inmates and thus allow a greater inmate population on each block than that which the magistrate judge determined was constitutionally allowable." *Id.* at 3. The magistrate said that the improvements to D and B block do reinforce the conclusion that double celling on the first two tiers of each block can be accommodated without stepping over constitutional boundaries.

At the hearing before this court on February 5, 1992, it was represented that defendants do not presently intend to double

bunk the B–North block, which is being renovated and is presently intended for use for mental health inmates on a single cell basis. Also, it was represented that showers which were required by the magistrate on B block have now been installed so that there are now four showers on each tier. Further, that ninety-seven percent of the inmates in the Wasatch Unit are now employed, rather than forty percent as found to exist at the time of trial before the magistrate.[3] Moreover, forty to sixty percent of all inmates residing in blocks B and D are enrolled in educational, community, therapeutic or church related programs. One hundred percent of inmates residing in cell block C are enrolled in such programs. It was also pointed out that the required time in the assigned cells would be only seven hours per day, from 11:00 p.m. to 6:00 a.m.

*Court Inspection of Facilities*

A personal inspection tour of all of the areas within the Wasatch Unit was conducted by this judge on February 11, 1992. The findings of the magistrate set forth in this opinion were verified and are adopted, except as noted hereinafter. The Warden of the prison, Ms. Tamara Holden, certain other UDC officials and counsel for both parties were present when the inspection was made. The inspection revealed that all cell blocks of the Wasatch Unit are clean and have clearly marked fire exits. The following information supplemental to the magistrate's findings as to each block, including the dayroom and common areas, is found by the court to exist:

*C Block—Second Tier*

There is no inmate housing on the first tier of C block. The second tier, as found by the magistrate, is outstanding. Block C has one large common area equipped with a pool table, several couches, a television, a weight lifting set, a coffee machine, a water fountain, an ice machine and two telephones for inmate use. There is no outdoor recreational area for the exclusive use

---

**3.** Counsel for plaintiffs represented that the rate of increase in employment was effectuated by splitting available jobs so that inmates who had worked eight hours per day now work only about four hours per day.

of inmates on C block such as there is on B and D blocks and on B block North. There are thirty C block second tier cells and they are the largest cells (82 square feet each) at the Wasatch Unit, each cell having a shower, toilet and wash basin. The second tier is also equipped with air conditioning, carpeting, smoke detectors, a fire hose and two fire extinguishers. There is one stairwell that functions as the fire escape for both the second and third tiers of C block, accessible from the second tier and leads to the first floor administrative area. No deficiencies exist which would preclude double celling on the second tier.

### D Block

The D block has been substantially renovated. It has thirty-two cells on each tier and the physical layout of each tier is identical. Adequate common areas and three additional showers have been created at one end of the main corridor of each tier by the removal of four cells. Each tier now has four showers. The common areas have one folding table and several folding chairs, an ice machine, a coffee machine, a water fountain, and two telephones for inmate use. The main corridor between cells is not used as a dayroom area as it is in B block. The inmates on D block have exclusive access to a sizeable outdoor recreational area. Each cell has an air vent and window that can be opened to regulate air temperature and flow. Each tier has four to five smoke detectors in the main corridor, a fire hose and two fire extinguishers. There is an adequate outdoor fire escape. No fire hazard on any of the tiers exists.

### B Block

When this litigation began, B block had only one shower per tier. Renovations have been made by removal of two cells per tier, adding three new showers per tier, so that there are presently four showers on each tier. The shower arrangement is now adequate for the inmates on B block. Similar to D block each tier now has access to an external fire escape stairway which is adequate. The external fire escape was constructed after this litigation commenced. The physical layout of each tier is identical, with forty cells of equal size on all tiers, except that one cell on the first tier is presently unusable due to plumbing problems. Each cell has an air vent and a window that can be opened to help regulate temperature and air flow. The corridor between the cells is unusually wide. Two or three folding tables and four to six folding chairs are arranged on each tier for use in the corridors. Each tier has a water fountain, a coffee machine and two telephones for inmate use. The corridors represent the only dayroom space or internal common area within B block. Renovation on each tier of B block would be possible in the same way that it was accomplished in D block, allowing for the construction of dayroom area by removal of cells at the far end of the corridor. It was represented to the magistrate at the trial and subsequent hearing in November 1991 that such similar construction would be accomplished at B block. This has not been done, and apparently at present there is no intention to do so.

### Block B—North

Block B North, in addition to having the smallest cells at the Wasatch Unit (53 square feet), has no separate dayroom area aside from the corridor space immediately adjacent to the cells. Each cell has a toilet, wash basin and no window. Each tier has fourteen cells and two showers, which are currently being remodeled. When renovations are complete each tier will have tables and chairs arranged in the corridor area. An outdoor recreational area adjacent to the cell block is available for B–North block inmates' exclusive use.

Because B–North block is contemplated as being used for acutely mentally ill patients, the first tier is being renovated for use as a treatment center and group therapy. It is doubtful whether double celling could appropriately be instituted on B–North, however, even with the contemplated changes.

### C Block—Third Tier

The third tier of C block is the most spartan and restrictive area within Wasatch Unit. This was known as the "death row" area and was so utilized prior to construction of the Oquirrh Unit, now the

maximum security unit at USP. There is one area with a somewhat wider corridor than the rest, which accommodates a ping pong table. Otherwise, there is no dayroom area. However, inmates may descend the stairs to utilize common space on the second tier.

Block C third tier has a telephone for inmate use, one folding table and one chair. There is no outdoor recreational area devoted exclusively to the inmates housed on the third tier of C block. There are two showers, old but adequate for the present eight cells on a single occupancy basis. The cells are small (51 square feet) with no windows. Large antiquated, metal levers used to open cell doors extend horizontally about halfway across the corridor space at eye level when they are in the "open" position, so that in the event of fire inmates could be impeded in egress from the block. This, in addition to the fact that the only exit is down one flight of stairs to the second tier, creates a substantial hazard which would be unacceptable if the inmate population were doubled.

*Common Areas*

The dining area at the Wasatch Unit is large and could accommodate up to approximately two hundred and thirty inmates. Generally, however, about only one hundred and twenty dine at any one time. The inmates are admitted for meals on a staggered basis, one cell block at a time. The kitchen is very large, clean and modern, equipped with a full service bakery. Health regulations prohibit the kitchen and dining area from being used as a dayroom or common area. The dining area is only open during the hours when food is served to the general inmate population. It is apparent that the kitchen and dining room could accommodate all additional inmates if there were double bunking.

The library at the Wasatch Unit is open from one o'clock in the afternoon until eight thirty at night. Novels, newspapers and a small collection of law books are available. The library has four large reading tables, approximately thirty chairs, and one typewriter. Inmates can remain in the library as long as they desire except that they are required to report to their cells for regularly scheduled "head counts."

The Wasatch Unit has a nondenominational chapel that seats approximately one hundred and fifty people or more. Six part time chaplains are employed at the chapel. The chapel has two large and two small classrooms that are used for educational, religious and community programs such as bible study and courses for high school and college credit. An additional room has microfiche viewing machines and microfiche files, used by inmates researching their genealogy. Just outside of the chapel is a sweat lodge built and used by American Indians on Saturdays for religious purposes. The sweat lodge is available year round.

The gymnasium is open for all inmates' use from one o'clock until eight thirty in the evening. In addition to one full size basketball court, there are two pool tables, one ping pong table, one stationary exercise bicycle, two boxing punch bags, one weight lifting set, and a trampoline built for use by one person. Additionally, inmates have access to several board games and two television monitors for use with video game cartridges. Approximately twenty inmates can use the facilities at any one time. When basketball games are held fifty-five or more inmates may be present, either actively participating or observing the game.

## ANALYSIS

 The legal issue presented is whether double celling in any of the cell block tiers within the Wasatch Unit would violate the constitutional prohibition against cruel and unusual punishment under the Eighth Amendment. In this regard, it is well established that federal courts should not micromanage state prison systems. *See Coniglio v. Thomas*, 657 F.Supp. 409, 414 (S.D.N.Y.1987); *Wooden v. Norris*, 637 F.Supp. 543, 555 (M.D.Tenn. 1986). Moreover, a federal judge is not a warden and substantial deference must be accorded state prison authorities in the management of correctional facilities. *See Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct.

1861, 1878, 60 L.Ed.2d 447 (1979); *Turner v. Safley*, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 353, 107 S.Ct. 2400, 2406, 96 L.Ed.2d 282 (1987). *See also Dunn v. White*, 880 F.2d 1188 (10th Cir.1989). "Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Whitley v. Albers*, 475 U.S. 312, 321–22, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986) (quoting *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979)). This court may not impose its own views of enlightened correctional policy on state correctional authorities. *See Rhodes v. Chapman*, 452 U.S. 337, 352, 101 S.Ct. 2392, 2402, 69 L.Ed.2d 59 (1981); *Oliver v. Thornburgh*, 587 F.Supp. 380, 383 (E.D.Pa.1984). However, the deference accorded correctional staff is not absolute. *Williams v. Lane*, 851 F.2d 867, 871 (7th Cir.1988). In this regard, inmates may not be confined in unsafe conditions. *See Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).

### I. DOUBLE CELLING: IMPACT UPON CONDITIONS OF CONFINEMENT

#### A. *Double Celling—Not Unconstitutional in and of Itself*

The Supreme Court has made it clear that double celling does not violate the Eighth Amendment per se. In *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), the Supreme Court found no evidence that double celling constituted "wanton and unnecessary infliction of pain" or that it is "grossly disproportionate to the severity of the crime warranting imprisonment." 452 U.S. at 348–49, 101 S.Ct. at 2400. Rather, double celling was regarded as only one factor in the Eighth Amendment analysis and not necessarily indicative of conditions which violate human decency. The Court concluded that "at most" plaintiff's theory amounts "to a

theory that double celling inflicts pain." [4] *Id.* at 348–49, 101 S.Ct. at 2400.

#### B. *Conditions of Confinement—Objective Tests*

The Supreme Court said in *Rhodes*:

No static 'test' can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment 'must draw its meaning from the *evolving standards of decency that mark the progress of a maturing society.*'

*Id.* at 346, 101 S.Ct. at 2399 (emphasis added) (citation omitted).

\* \* \* \* \* \*

The double celling made necessary by the unanticipated increase in prison population did not lead to deprivations of essential *food, medical care,* or *sanitation.* Nor did it increase *violence among inmates* or create *other conditions intolerable for prison confinement.* Although job and educational opportunities diminished marginally as a result of double celling, limited work hours and delay before receiving education do not inflict pain, much less unnecessary and wanton pain; deprivations of this kind simply are not punishments. We would have to wrench the Eighth Amendment from its language and history to hold that delay of these desirable aids to rehabilitation violates the Constitution.

*Id.* at 348, 101 S.Ct. at 2400 (emphasis added) (citation omitted).

In *Wilson v. Seiter*, —— U.S. ——, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) the Supreme Court reinforced its ruling in *Rhodes*, rejecting the contention that double celling constitutes cruel and unusual punishment or that it causes "the 'unnecessary and wanton infliction of pain that violates the Eighth Amendment.'" 111 S.Ct. at 2324. The plaintiff in *Wilson* alleged that a number of conditions in his place of confinement constituted cruel and unusual punishment. *Id.* The Court rejected this approach and ruled that in order for plain-

---

**4.** In *Rhodes* each cell was 63 sq. feet.

tiffs to establish an Eighth Amendment violation they must demonstrate objectively that they were deprived of one or more essential human needs. The Court said:

> *Some* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a *single, identifiable human need such as food, warmth, or exercise. . . .* To say that some prison conditions may interact in this fashion is a far cry from saying that all prison conditions are a seamless web for Eighth Amendment purposes. *Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment* when no specific deprivation of a single human need exists.

*Id.* at 2327 (emphasis added).

In *Rhodes* the Court identified the following as essential human needs: food, medical care, sanitation, protection from violence among inmates "or other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348, 101 S.Ct. at 2400. *See also Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976); *Inmates of Occoquan v. Barry*, 844 F.2d 828, 836 (D.C.Cir.1988). In *Wilson* the Court also identified exercise as a basic human need. *Wilson*, 111 S.Ct. at 2327. None of the aforesaid essential human needs would be implicated at the Wasatch Unit if double celling were instituted. Fire safety and adequacy of shelter (including cell and extended spaced) have been identified as essential human needs falling within the rubric of "other conditions intolerable for prison confinement." *Id. See also Clemmons v. Bohannon*, 956 F.2d 1523, 1527 (10th Cir.1992); *Barry*, 844 F.2d at 836–39; *Coniglio*, 657 F.Supp. at 414; *Dohner v. McCarthy*, 635 F.Supp. 408, 425 (C.D.Cal.1985); *Ramos v. Lamm*, 639 F.2d 559, 566, 566 & n. 8 (10th Cir.1980). Improvements made at the Wasatch Unit since this litigation was commenced have satisfied the fire safety concerns as is discussed hereinafter. The impact of double celling upon adequacy of shelter and living space is the primary focus. The factors which this court considers to bear upon whether double celling would render shelter arrangements so overcrowded under objective standards as to constitute "cruel and unusual punishment" are: (1) cell size; (2) length of required time within the cell; (3) adequacy of ventilation; (4) availability of adjacent common space and other general common space during hours outside the cell; (5) adequacy of showers; (6) personal safety from violence within the cell; and (7) opportunities for participation in educational or employment programs. In reaching the conclusions set forth herein, this court applies these factors to the areas at issue in this case.

## C. *State of Mind—Subjective Test*

In *Wilson* the Supreme Court added to the objective standards set out in *Rhodes* by which the seriousness of the deprivation relative to conditions of confinement may be determined, a subjective component, with regard to the prison officials' state of mind. The Court ruled that a prison official's state of mind must be inquired into "when it is claimed that the official has inflicted cruel and unusual punishment." 111 S.Ct. at 2324. In this regard, the Court said:

> The source of the intent requirement is not the predilections of this Court, but the Eighth Amendment itself, which bans only cruel and unusual *punishment.* If the pain inflicted is not formally meted out *as punishment* by the statute or the sentencing judge, *some mental element must be attributed to the inflicting officer* before it can qualify.

*Id.* at 2325 (emphasis added).

The *Wilson* court then went on to hold that the state of mind requirement which applies in cases challenging prison conditions is "deliberate indifference." In adopting this standard, which previously had been applied in *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), a medical needs case, the Court said:

> There is no indication that, as a general matter, the actions of prison officials with respect to these nonmedical conditions are taken under materially differ-

ence constraints than their actions with respect to medical conditions. Thus, as retired Justice Powell has concluded: 'Whether one characterizes the treatment received by [the prisoner] as inhumane conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the "deliberate indifference" standard articulated in *Estelle*.' *LaFaut [v. Smith* ], 834 F.2d [389] at 391–392 [CA4 1987]. *See also Lopez v. Robinson*, 914 F.2d 486, 492 (CA4 1990); *Givens v. Jones*, 900 F.2d 1229, 1234 (CA8 1990); *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 556 (CA1), cert. denied, 488 U.S. 823, 109 S.Ct. 68, 102 L.Ed.2d 45 (1988); *Morgan v. District of Columbia*, 263 U.S.App.D.C. 69, 77–78, 824 F.2d 1049, 1057–1958 (1987).

*Id.* 111 S.Ct. at 2327.

In *Berry v. City of Muskogee*, 900 F.2d 1489, 1495–96 (10th Cir.1990), the Tenth Circuit described deliberate indifference thusly:

'Deliberate indifference,' while requiring a higher degree of fault than negligence, or even gross negligence, *City of Canton v. Harris*, 489 U.S. 378, 388 n. 7, 109 S.Ct. 1197, 1204 & n. 7, 103 L.Ed.2d 412 (1989), remains lower than the intentional and malicious infliction of injury reflected in the *Whitley* standard. We, therefore, hold that an official or municipality acts with deliberate indifference if its conduct (or adopted policy) disregards a known or obvious risk that is very likely to result in the violation of a prisoner's constitutional rights.

More recently, in *Clemmons v. Bohannon*, 956 F.2d 1523 (10th Cir.1992), the Tenth Circuit made it clear that allegations of harm caused as a result of an isolated act of negligence, or by the inadvertent failure by prison officials to provide one or more essential human needs does not "establish an Eighth Amendment violation because an intent requirement is implicit in the word 'punishment.'" At 1525–26. Deliberate indifference, then, appears to require the showing of knowledge of a need and an unwillingness to act on the part of the prison officials. *See Berry v. City of Muskogee*, 900 F.2d at 1495–96.

## II. CONDITIONS OF CONFINEMENT AT USP—WASATCH UNIT—AS IMPACTED BY DOUBLE CELLING

### A. *Subjective Component*

■ It appears that for a period of time, commencing approximately in 1986, prison officials did intend to double cell all of the blocks within the Wasatch Unit despite existing conditions of confinement which objectively would have caused deprivation of human needs of inmates, particularly as to adequacy of shelter and living space. Given the conditions of confinement at that time, the state of mind of prison officials amounted to "deliberate indifference" to the human needs of inmates. That does not appear to be the mind-set now. More recently, prison officials have responded in such a way as to markedly improve prison conditions, at least in some areas, which would make double celling objectively acceptable as measured by the constitutional prohibition against cruel and unusual punishment. Nevertheless, prison officials persist in their intention to double cell *all* of the tiers in all of the blocks within the Wasatch Unit. The blocks, and tiers within the blocks, however, are different and cannot be painted with one common brush. This court finds that the subjective state of mind of "deliberate indifference" has existed and presently exists as to areas where double celling objectively would render the conditions of confinement unconstitutional. Accordingly, we turn to a consideration of such objective standards on a block by block and tier by tier basis.

### B. *Objective Component*

Institution of double celling in the Wasatch Unit would not so impact inmates as to deprive them of human needs of food, medical care, sanitation, exercise or safety from violence within the cell. The court finds that fire safety concerns raised by the proposed plan to double cell have now been satisfied in all areas except C block third tier and block B–North. All areas within the Wasatch Unit now have adequate outdoor fire escape stairways, ade-

quate markings of fire exits and the availability of fire hoses and fire extinguishers on each tier.

■ With the exception of C block third tier and Block B–North, the human need of adequate shelter and living space will not be so impacted by double celling as to constitute an unconstitutional deprivation. Although the size of the cells in D block and B block makes double celling undesirable, this factor alone does not render double celling violative of the Eighth Amendment. Factors such as length of time required within the cell must be considered. In all of the areas within the Wasatch Unit inmates are required to be in their cells for only seven (7) hours each day, from 11:00 p.m. to 6:00 a.m. When not required to be in their cells, all inmates have equal access to educational and rehabilitative programs.

### D Block—Shelter

In D block adequate common areas separate from the cell blocks such as the library, gymnasium, and classrooms within the Chapel are available for all inmates. With adequate staffing, including additional security guards as rovers, and the application of methods in effect in other areas of the prison to match medium level offenders of non-violent proclivity as cell mates, personal safety will be maximized. Ventilation is adequate and would not be adversely impacted by double celling. Renovations on all three tiers of D block have provided sufficient additional showers per tier and adequate common space on each tier. Given these renovations, inmates in all three tiers of D block, if double celled would not be deprived of shelter and adequate living space.

### B Block—Shelter

Double celling in all three tiers of B block also would be constitutionally permissible, but only if construction similar to what has been done at D block relative to common area space were accomplished, as defendants represented it would be at the trial in 1990 and the hearing before the magistrate in November 1991. Adequate staffing and matching of cell mates under enlightened prison procedures would be required to meet person safety concerns. Ventilation is adequate and would not be adversely impacted by double celling. Renovations have provided a sufficient number of adequate showers on each tier.

### C Block—Shelter

■ It is manifest that double bunking on the second tier of C block would not violate the constitution, but it is also manifest that double bunking on the third tier of C block should not be permitted because it would violate the constitutional standard. Conditions of confinement in combination on the third tier of C block, including small cell size with no windows, no adjacent common area and inadequate fire escape and congestion caused by the cell release levers when opened would produce the effect of deprivation of the basic human need of shelter and adequate living space if double celling were to be instituted.

### Block B–North—Shelter

Block B North is in the midst of renovation and no double bunking is contemplated there because it is intended to be used as a single cell mental health facility. If that intention changes, the matter will be reassessed after construction is completed. However, it seems highly unlikely that double celling could be appropriately instituted there given the small cells with no windows and lack of common area for each tier of B–North block.

Based upon the foregoing, it is hereby

ORDERED, that the injunction prohibiting double celling in the Wasatch Unit in block C, third tier, and B–North block, is continued in full force and effect; it is

FURTHER ORDERED, that the injunction prohibiting double celling in block B is continued in full force and effect. Double bunking in B block may be permitted by further order of the court upon a showing that construction in B block of common areas on all three tiers similar to that accomplished at D block has been completed; it is

FURTHER ORDERED, that the injunction is dissolved as to C block, second tier, and double celling is permitted; it is

FURTHER ORDERED, that the injunction as to all three tiers of D block is dissolved and double celling is permitted; it is

FURTHER ORDERED, that the selection of inmates to be double celled and the number of staff officers assigned to double bunked cell blocks and additional security guards as rovers shall be in the sole discretion of prison officials in accordance with enlightened prison practices.

IT IS SO ORDERED.