**Pearlie B. JACKSON, Plaintiff,**

**v.**

**Warden BERGE, Captain Prieve, Major McClelland, Sergeant Goggins, Sergeant Martel, Sergeant Bensley, and Sergeant Cupery, Defendants.**

No. 92–C–817.

United States District Court, E.D. Wisconsin.

Sept. 30, 1994.

Pearlie B. Jackson, pro se.

David E. Hoel, Asst. Atty. Gen., Madison, WI, for defendants.

## DECISION AND ORDER

CURRAN, District Judge.

Pearlie B. Jackson, a prisoner in state custody, commenced the above-captioned action *in forma pauperis* against Gerald Berge, Warden of the Fox Lake (Wisconsin) Correctional Institution, and six other prison employees in what the court construes as their official and personal capacities. Jackson claims that the Defendants violated his civil rights when they placed him in a cell with a prisoner who smoked and when they refused to transfer him to another cell despite their knowledge of his medical condition and despite his complaints. Jackson is seeking in-

junctive and monetary relief pursuant to 42 U.S.C. § 1983.

The Defendants answered denying all liability and raising the defense of qualified immunity. Then, the United States Supreme Court granted certiorari in a case raising a similar issue—whether a prisoner's civil rights are violated by being exposed to second hand smoke. *See Helling v. McKinney,* — U.S. ——, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). This court stayed the proceedings in Jackson's case until this issue was resolved. Meanwhile, Jackson was transferred to the Columbia Correctional Institution. The following year, the Supreme Court issued its opinion in *Helling v. McKinney.* The parties in the Jackson case then rebriefed the Defendants' dispositive motion and, shortly thereafter, Jackson was transferred back to the Fox Lake Correctional Institution where, he claims, he was once again housed with a cellmate who smoked. Because this event might have some bearing on Jackson's request for injunctive relief, this issue was also rebriefed. The Defendants' summary judgment motion is now fully briefed and ready for decision.

## I. FINDINGS OF FACT

In connection with their motion for summary judgment, the Defendants have submitted the following proposed findings of fact:[1]

1. Plaintiff, Pearlie Jackson, at the times relevant to this action was incarcerated at the Fox Lake Correctional Institution (FLCI), Fox Lake, Wisconsin.

2. Plaintiff Jackson is presently incarcerated.... [at the Fox Lake Correctional Institution].

3. Defendant, Gerald Berge, is and at the time relevant to this action was the Warden at FLCI.

4. As Warden, Defendant Berge has the duties and responsibilities as generally defined by sec. 302.04, Wis.Stats., and as otherwise specifically set forth in the Wisconsin Statutes and Wisconsin Administrative Code. Included among Defendant Berge's duties as

---

**1.** *See* Defendants' Proposed Findings of Fact and Conclusions of Law at 1–15 (citations omitted and spelling of Defendants' names corrected).

Warden, he is responsible for the overall operation and administration of the institution, including the formation of institution policies applicable to inmates.

5. During 1992 Defendant Prieve was a Captain working at FLCI when the Plaintiff was confined there.

6. During 1992 Defendant McClelland was the Major working at FLCI when the Plaintiff was confined there.

7. During 1992 Defendant Goggins was a Sergeant working in a unit housing the Plaintiff.

8. During 1992 Defendant Martel was a Sergeant working in a unit housing the Plaintiff.

9. During 1992 Defendant Bensley was a Sergeant working in a unit housing the Plaintiff.

10. During 1992 Defendant Cupery was a Sergeant working in a unit housing the Plaintiff.

11. The Plaintiff was an inmate at FLCI during the time period of June 11, 1992, to June 11, 1993. Plaintiff was assigned to Unit 3, B–Wing, Room 334 on June 12, 1992. While confined at FLCI, Plaintiff shared Room 334 with a roommate, inmate Jerome Cooper, from June 12, 1992, until October 30, 1992, except for July 12–13, 1992, when Plaintiff was confined in the FLCI Health Services Unit (HSU) and July 22–26, 1992, when Plaintiff was placed in Temporary Lockup (TLU) status. ....

12. Because the number of inmates assigned to FLCI is larger than the number of rooms available to house them, inmates are required to share rooms while confined there.

13. As Warden, Defendant Berge does not personally make assignments of inmates to particular living quarters. This duty is carried out by a subordinate staff member, without Defendant Berge's personal supervision.

14. FLCI does not have sufficient housing facilities in light of population pressures to set up separate units to house prisoners who smoke and prisoners who do not smoke; particularly considering the need for flexibility in assigning prisoners to particular housing units for security reasons. Therefore it becomes necessary to assign prisoners who smoke to share rooms with prisoners who do not smoke.

15. Smoking has not heretofore been banned at FLCI due to concern that such a ban might cause a disturbance among smoking inmates, particularly those addicted to tobacco smoking and those who use tobacco to help them relieve tensions arising from prison life. In addition, banning smoking might lead to an underground market in contraband tobacco products resulting in smuggling such products into the institution, strongarming, gambling, prostitution and exacerbation of gang activities. State statutes regulating smoking do not apply to correctional institutions.

16. On March 31, 1992, Defendant Berge issued a room assignment policy to the FLCI housing units, indicating that based on emergency overcrowding conditions inmates would be housed in double rooms upon admission to FLCI.

17. To accommodate non-smoking inmates, as part of this housing policy, an attempt was to be made to house smokers with smokers and non-smokers with non-smokers in shared rooms. When it became necessary to house a smoker with a non-smoker the shared room would become a non-smoking room. This means that the smoker was not to smoke in the shared room; but he was to confine his smoking to those areas in FLCI designated for smoking. In general, inmates in general population may move outside their assigned rooms from 7:00 a.m. to 9:00 p.m. each day.

18. The smoker sharing the room is specifically informed by security staff that he is not to smoke in such a shared room. And security staff subsequently enforce such an order with warnings and disciplinary action under Wis.Admin.Code ch. DOC 303, if the smoker persists in ignoring the order not to smoke in the shared room.

19. Defendant Berge does not personally advise inmates of this policy upon room assignment; nor does Defendant Berge personally enforce this policy with warnings and by issuing disciplinary conduct reports. Defen-

dant Berge depends on FLCI security staff employees to perform these duties.

20. As part of the room assignment policy housing unit changes were only to be made by authorization of the FLCI Security Director. Housing unit changes were to be made only if serious problems existed for the inmate in his assigned unit.

21. After the FLCI administration was made aware of complaints by the Plaintiff in June of 1992 that his roommate, Jerome Cooper, was smoking in their shared non-smoking room, as part of the duties of Defendants Goggins, Martel, Bensley and Cupery, they were assigned to monitor the room for any evidence of tobacco use by inmate Cooper.

22. In the process of monitoring the Plaintiff's room, Defendants Goggins, Martel, Bensley and Cupery never observed or discovered any physical evidence or other objective proof that inmate Cooper was smoking therein.

23. Defendants Goggins, Martel, Bensley and Cupery had no authority to transfer the Plaintiff from his assigned room to another. Defendants Martel, Bensley and Cupery had no control over the Plaintiff's housing assignment upon admission to FLCI.

24. On June 24, 1992, Defendant Goggins noted on inmate Cooper's warning card that he had given him a direct order not to smoke in his room, and if he did smoke there he would be sent to TLU. Defendant Goggins also noted that Defendant Prieve was aware of this order and approved of it.

25. Defendant Prieve approved the action of June 24, 1992, where Defendant Goggins gave inmate Cooper a direct order not to smoke in the shared room, and indicated that Cooper would be placed in TLU if a violation of the order occurred.

26. Defendant Prieve personally discussed this matter with the Plaintiff and inmate Cooper. In this meeting Cooper indicated that he was not smoking in the room, and Defendant Prieve told him he would be disciplined if he did so.

27. Defendant Prieve also discussed with Cooper and the Plaintiff alleged threats made by Cooper to the Plaintiff. Defendant Prieve informed them that they should settle their differences and that disciplinary action would follow if they were not able to.

28. In the course of Defendant Martel's duties he questioned other inmates living in the same unit, who all confirmed that inmate Cooper was not smoking in the room shared with the Plaintiff.

29. While on duty on July 12, 1992, the Plaintiff complained to Defendant Martel of chest pain, shortness of breath and headaches. Defendant Martel called the Health Services Unit (HSU) nurse about the situation. Defendant Martel reported to the nurse that the Plaintiff's color was good and that his skin was dry. The nurse advised that the Plaintiff be admitted to HSU, which is the FLCI facility responsible for providing health care services to inmates.

30. The Plaintiff signed inmate complaint No. 597–92 pursuant to Wis.Admin. Code ch. DOC 310, seeking a room change on June [sic] 16, 1992. The Inmate Complaint Investigator (ICI) referred the Plaintiff to the unit sergeant to see if a room change could be arranged, and dismissed the complaint. Defendant Berge accepted the ICI's recommendation deeming it appropriate under the FLCI housing policy.

31. On July 16, 1992, Defendant Goggins made out Incident Report No. 130406 describing an incident where the Plaintiff approached him demanding to see the unit log entry showing that his room was a non-smoking room. Defendant Goggins informed the Plaintiff that the unit log would not show this information; which information was contained on a separate range card. The Plaintiff did not accept this explanation and continued to demand to see the log. It was Defendant Goggins' impression that the Plaintiff pushed this issue about the log to try to make it appear that staff were not doing their job concerning enforcement of the non-smoking order.

32. On July 16, 1992, the Plaintiff signed Inmate Complaint No. 696–92, again complaining that he was being subjected to smoke in his room from his roommate. The ICI reported that according to FLCI Ser-

geant Goggins the Plaintiff's roommate was instructed that their shared room was a no-smoking room. According to the ICI, security staff monitor the room when they are able; but cannot post themselves exclusively outside the door of that one room. The ICI stated that his investigation indicated that staff had taken appropriate action and were doing what they could to enforce the no-smoking policy for that room. Staff were continuing their monitoring, and the Plaintiff should contact the Security Director as per the FLCI housing policy if he couldn't otherwise solve the problem. On that basis the ICI recommended that this complaint be dismissed. Defendant Berge concurred with this recommendation, which he felt to be appropriate on the basis of the information obtained by the ICI.

33. On July 17, 1992, Defendant Goggins made out Incident Report No. 130393 concerning allegations by the Plaintiff that his roommate continued to smoke in their shared room. Defendant Goggins noted that inmate Cooper had been warned about this on June 24, 1992. Defendant Goggins also noted that all shifts had been made aware of this order and that a notation was placed on the range card showing the shared room to be a non-smoking room. Defendant Goggins indicated that since June 24, 1992, no staff member had observed Cooper smoking in this room and that Cooper had removed the ashtray from the room. Despite this the Plaintiff continued to complain. Cooper was again warned about smoking in his room; this time by FLCI Captain St. Louis. Cooper came back from this meeting highly upset and informed Defendant Goggins that he had not been smoking in the room and that he was tired of the Plaintiff playing games with him. No smoke had been observed from the room by any staff member. It was Defendant Goggins' opinion that Cooper had made an effort to solve the problem. The Plaintiff had not taken a staff member to the room when Cooper was allegedly smoking, yet he continued to complain that this was a constant problem. It was Defendant Goggins' opinion that the Plaintiff was trying to play some type of game to get a single room ahead of other inmates by complaining fre-

quently about this situation for which there was no proof.

34. On July 17, 1992, the Plaintiff signed Inmate Complaint No. 715–92, complaining of a threat by his roommate and continued exposure to tobacco smoke. The ICI's investigation included statements by all four sergeants in his housing unit that the Plaintiff's roommate was not smoking in their room. Defendant Martel was reported to have spoken with a number of other inmates in that housing unit, who informed him that the Plaintiff's roommate was not smoking in their room. There was no evidence of either cigarette butts or smoke in the room according to these sergeants. The ICI examined the Plaintiff's medical file and found only two entries concerning smoke. One earlier entry from another institution indicated that smoke bothered the Plaintiff, and another entry from July 13, 1992, indicated that the Plaintiff should be housed with a non-smoker. The ICI interviewed FLCI Nurse Rusch who informed him that housing the Plaintiff in a designated no-smoking room where the other inmate was not smoking met that criterion. The ICI noted that when the doctor saw the Plaintiff the day after he was admitted to the HSU there were no indications of any trouble and that there was no history of heart problems. The ICI concluded that if the Plaintiff was incorrect about his roommate smoking in his room it was his belief that the Plaintiff was also incorrect about "threats" received from his roommate. The ICI recommended dismissal of the complaint. Defendant Berge concurred with this recommendation, feeling that it was appropriate on the basis of information obtained by the ICI.

35. On July 20, 1992, the Plaintiff reported to Defendant Martel that his roommate, inmate Cooper, had threatened his personal safety. Defendant Martel spoke to both inmates, advising them to resolve their differences peacefully. These inmates were sent to Defendant Prieve to discuss the alleged smoking problem. Defendant Martel continued to monitor this situation, during which time no report of any harm was made to Defendant Martel by the Plaintiff. Defendant Martel made up Incident Report No. 130404 concerning this matter.

36. Defendant Berge was not made aware of any physical evidence or other objective proof that the Plaintiff's roommate failed to obey the no-smoking order which pertained to their shared room at FLCI.

37. Any communication sent directly to Defendant Berge by the Plaintiff concerning his roommate smoking in their shared room was referred to the Plaintiff's housing unit for security staff to monitor the situation to see if any action was necessary. It was Defendant Berge's understanding that the security staff could not find any objective proof that the Plaintiff's roommate was smoking.

38. One such communication, dated July 21, 1992, was referred to the security staff and resulted in a conduct report written by Defendant Prieve charging the Plaintiff with disrespect contrary to Wis.Admin.Code. § Doc 303.25 and lying contrary to § DOC 303.27.

39. The Plaintiff was placed in TLU status, pursuant to § DOC 303.11 in conjunction with this incident.

40. The Plaintiff was subsequently found guilty of both charges by the adjustment committee.

41. On appeal Defendant Berge reversed the adjustment committee on the charge of lying and affirmed its guilty determination on the disrespect charge.

42. On July 22, 1992, Defendant Prieve wrote up Adult Conduct Report No. 482463 charging the Plaintiff with disrespect, contrary to Wis.Admin.Code § DOC 393.25, and lying, contrary to § DOC 303.27, based on the contents of a letter written to Defendant Berge.

43. Defendant Prieve personally never observed or discovered any physical evidence or other objective proof that inmate Cooper was smoking in the shared room.

44. It was Defendant Prieve's understanding that although Defendant Berge referred the Plaintiff's complaints about inmate Cooper's alleged smoking to the unit staff for monitoring, none of the staff observed or discovered any physical evidence or other objective proof of inmate Cooper smoking in the shared room.

45. Defendant Prieve had no authority to transfer the Plaintiff from his assigned room to another. Defendant Prieve did not determine the Plaintiff's housing assignment upon admission to FLCI.

46. The Plaintiff signed Inmate Complaint No. 726–92, in which he complained of his roommate smoking. The ICI's report restated information obtained in his report on Inmate Complaint No. 715–92. In addition, the ICI stated, "My investigation of numerous complaints filed by inmate Jackson all indicate Jackson's roommate is definitely not smoking in the room." The ICI also indicated that if the Plaintiff wanted to change his room he should contact the Security Director as per FLCI housing policy. Defendant Berge concurred with the ICI's recommendation that the complaint be dismissed as a reasonable conclusion in light of the information obtained by the ICI as a result of his investigation.

47. The Plaintiff signed Inmate Complaint No. 778–92 on August 3, 1992, complaining of a lack of smoke free areas at FLCI. The ICI's report indicates that the Plaintiff's medical file only mentions that smoke bothers the Plaintiff and that he should be housed with a non-smoker. His assignment to a non-smoking room was medically acceptable. The ICI went on to note that the Corrections Complaint Examiner (Wis.Admin.Code § DOC 310.09) had previously reviewed the FLCI smoking policy and found it to be acceptable and in compliance with state statutes. The ICI's recommendation to dismiss this Inmate Complaint was accepted by Defendant Berge as a reasonable resolution in light of the information obtained by the ICI in his investigation.

48. On September 5, 1992, Defendant Goggins made out Incident Report No. 190261 in which he noted that although the Plaintiff had been issued a cane the day before for a knee or leg injury, he had observed the Plaintiff walking around with no apparent limp or injury. It was reported later that day that the Plaintiff was playing scrimmage football with the unit team. The

cane was picked up from the day room where the Plaintiff had left it.

49. On September 21, 1992, Defendant Goggins made out Incident Report No. 190261 in which he again noted his impression that the Plaintiff by his constant complaining about wanting a non-smoking room, even though his roommate did not smoke, appeared to be attempting to get FLCI to give him a single room under the pretense of a serious medical problem. Defendant Goggins noted that despite the Plaintiff's complaints he sits in common rooms in the unit which are usually filled with tobacco smoke and appears to have no trouble at those times. Defendant Goggins again noted that staff never find any smoke in the shared room.

50. The Plaintiff requested a transfer to a new room, claiming he had health problems which were made worse by his roommate's smoking in their shared non-smoking room. As the Major defendant McClelland was in charge of initial room assignments and transfers under the FLCI housing policy.

51. Under the FLCI housing policy transfers are to be made only if serious problems exist for the inmate in his present unit.

52. It was Defendant McClelland's understanding on the basis of information he received from security staff on the unit housing the Plaintiff that there was no physical evidence or other objective proof that the Plaintiff's roommate was smoking in their shared room. Defendant McClelland therefore determined that the Plaintiff had been provided with a non-smoking room under FLCI housing policy and there was no need to move the Plaintiff at that time to a different room.

53. Security concerns require that room transfers be made with care. An inmate may lie about adverse conditions in his present room to manipulate placement to a single room or a room with another inmate with whom he may seek to carry on gang activities or other activities that violate the statutes or administrative code. An inmate may seek to manipulate his housing placement with another inmate whom he may feel he can victimize by extortion, prostitution or strongarming. An inmate may also falsely accuse his roommate of misbehavior in order to get the roommate in trouble, set up a blackmailing situation or otherwise intimidate the roommate. Therefore, objective evidence of misbehavior on the part of the roommate is important before a transfer is approved on the basis of such allegations.

54. In Defendant Berge's decisions concerning the Plaintiff, he did not intend to harm the Plaintiff. Defendant Berge relied on his subordinates to investigate, carry out their duties and enforce the FLCI smoking policy. At no time was Defendant Berge made aware of any physical evidence or other objective proof that the Plaintiff's roommate was smoking in their shared room; nor was such evidence presented to him that FLCI was not in compliance with any medical orders concerning the Plaintiff.

55. None of the Defendants, Berge, Prieve, McClelland, Goggins, Martel, Bensley or Cupery, had an intent to harm the Plaintiff in their contacts with him.

Jackson's version of the material facts differs mainly in that he claims to have entered prison with serious medical conditions—asthma and heart problems—which were aggravated by the second hand smoke. He also depicts each of the Defendants as being personally involved in the decisions not to afford him a transfer. He says that they retaliated against him for complaining. Aside from these issues, the court will regard the propositions of fact to which the Plaintiff has not responded as true for purposes of resolving this motion.

## II. *LEGAL STANDARDS FOR SUMMARY JUDGMENT*

■ Under Federal Rule of Civil Procedure 56(c), parties moving for summary judgment must show that the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movants are entitled to a judgment as a matter of law. *See Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *McGraw–Edison Company v. Walt Disney Productions*, 787 F.2d 1163, 1167 (7th

Cir.1986). When faced with a properly supported motion for summary judgment, the nonmovant may not avoid judgment by simply resting on his pleadings. If the nonmovant bears the burden of persuasion on an issue at trial, he must affirmatively demonstrate, by specific showings, that there is a genuine issue of material fact requiring a trial. *See First National Bank of Cicero v. Lewco Securities Corporation*, 860 F.2d 1407, 1411 (7th Cir.1988).

■ A "genuine" factual issue is one that properly can be resolved only by a finder of fact because it may reasonably be resolved in favor of either side. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. at 2510.

■ A summary judgment procedure is not meant to be a trial on affidavits. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.... The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. at 2513. At the summary judgment stage the judge's function is to determine whether there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *See First National Bank of Arizona v. Cities Service Company*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968). This inquiry implicates the substantive evidentiary standard of proof that would apply

at a trial on the merits. Thus, in a civil case such as this, the record must show that the trier of fact could find by a preponderance of the evidence that the Plaintiff is entitled to a judgment in his favor. *See Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512. If the Plaintiff's evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See Id.* at 249–50, 106 S.Ct. at 2510–11.

■ A summary judgment motion will not be denied merely on the basis of a "metaphysical doubt" about the facts, *Matsushita Electric Industrial Company, Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986), "or on the basis of conjecture or surmise," *Bryant v. Maffucci* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). Courts need not be reluctant to grant summary judgment in appropriate cases since "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims." *Celotex Corporation v. Catrett*, 477 U.S. at 323–24, 106 S.Ct. at 2553–54.

Guided by these standards, the court will now proceed to determine whether the Defendants are entitled to judgment under the applicable law, which, in this case, is found in Section 1983 of Title 42 of the United States Code and the cases decided thereunder.

## III. *DISCUSSION AND DECISION*

The Plaintiff claims that the Defendants deprived him of his Eight Amendment[2] right to be free of cruel and unusual punishment imposed as part of his conditions of confinement when they housed him with a cellmate who smoked despite the Defendants' knowl-

---

2. Although Jackson has laced his submissions with procedural due process catch phrases, it does not appear that he is claiming that he was denied notice or an opportunity to be heard or that any procedures afforded him were inadequate or unfair. Therefore, the court will address only the claim that he was deprived of the substantive right to be free of cruel and unusual punishment. *See Whitley v. Albers*, 475 U.S. 312, 326–27, 106 S.Ct. 1078, 1087–88, 89 L.Ed.2d 251 (1986) (Due Process Clause of the Fourteenth

Amendment affords prisoner no greater protection than the cruel and unusual punishment clause of the Eighth Amendment); *Clemmons v. Bohannon*, 918 F.2d 858, 869 (10th Cir.1990) (prisoner's claim that involuntary exposure to environmental tobacco smoke violated his due process rights under Fourteenth Amendment was effectively subsumed within his Eighth Amendment claim), *vacated on other grounds*, 956 F.2d 1523 (10th Cir.1992) (en banc).

edge that smoke aggravated his "serious" medical conditions. Contrary to Jackson's assertions, neither the United States Supreme Court nor the Seventh Circuit Court of Appeals has ever held that a prisoner has an absolute constitutional right to a smoke-free environment. *See Helling v. McKinney,* —— U.S. ——, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993); *Steading v. Thompson,* 941 F.2d 498 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1206, 117 L.Ed.2d 445 (1992). In *Helling v. McKinney,* the Supreme Court resolved a split among the circuits when it held that a prisoner could maintain an Eighth Amendment claim if he could prove that correctional officials, acting with deliberate indifference, exposed him to so high a level of environmental tobacco smoke that he would be likely to suffer serious health problems in the future. *See Helling v. McKinney,* —— U.S. at ——, 113 S.Ct. at 2481. Prior to the *Helling v. McKinney* decision, most courts allowed prisoners to proceed only on claims that the current state of their health was being adversely affected by second-hand smoke. *See, e.g., Clemmons v. Bohannon,* 956 F.2d 1523 (10th Cir.1992) (en banc).

Although Jackson cannot assert an absolute right to a smoke-free cell, he is also attempting to prove that, by refusing to transfer him to a cell with a nonsmoker, the Defendants caused a worsening of what he alleges were his preexisting asthmatic and heart conditions. In order to survive summary judgment on such a claim, Jackson must produce affidavits or other evidence that would satisfy both prongs of a bifurcated test. First, he must show that, objectively, the conditions were serious enough to be considered cruel and unusual. Specifically, Jackson must establish that he was being unwillingly exposed to environmental tobacco smoke and that the smoke was of such an unreasonable level that it caused or aggravated a serious medical problem. *See Helling v. McKinney,* —— U.S. at ——, 113 S.Ct. at 2482; *Estelle v. Gamble,* 429 U.S. 97, 104–05, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976). Second, from a subjective point of view, he must show that the Defendants acted with a sufficiently culpable state of mind. *See McNeil v. Lane,* 16 F.3d 123, 124 (7th Cir.1993). In *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), the Supreme Court held that, where a prisoner alleges inhumane conditions of confinement or a failure to attend to his medical needs, the standard for that state of mind is the "deliberate indifference" standard. *See Id.* at 302–04, 111 S.Ct. at 2326–27. The Seventh Circuit has explained that, to establish deliberate indifference, a plaintiff must prove that:

> ... officials ... "want [ ] harm to come to the prisoner," or, at least, "recklessness," which, for purposes of the Eighth Amendment, entails "actual knowledge of impending harm easily preventable so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it."

*Duane v. Lane,* 959 F.2d 673, 676 (7th Cir. 1992) (quoting *Duckworth v. Franzen,* 780 F.2d 645, 653 (7th Cir.1985), *cert. denied,* 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986)). In other words, Jackson must show that the Defendants possessed a total unconcern for his welfare in the face of serious risks. *See McNeil,* 16 F.3d at 124.

■ Moving for summary judgment, the Defendants argue that there is an absence of evidence supporting either prong of the test governing Jackson's Eighth Amendment claim. The court agrees. In support of the objective component of the test, Jackson has produced no competent evidence that he has a serious medical condition or that second-hand smoke caused or aggravated any illness. He claims to have asthma and to suffer from chest pains, but he has produced no expert opinion or other competent evidence to support this self-diagnosis. The Plaintiff has submitted (without affidavit[3]) a number of medical progress notes from Fox Lake and from the Green Bay Correctional Institution, where he was previously incarcerated. Jackson stakes his claim on a Green Bay doctor's memorandum of January

---

3. Jackson has failed to comply with Federal Rule of Civil Procedure 56(e) which requires facts to be established through affidavits or other vehi- cles designed to ensure reliability and veracity. *See Friedel v. City of Madison,* 832 F.2d 965 (7th Cir.1987).

23, 1991, and on other progress notes which advise that he should be housed with a non-smoker. However, the court can find no physician's diagnosis of asthma, heart disease or any other serious condition in these records. Likewise, Warden Berge alleges that a subordinate he asked to review Jackson's medical file found no mention of a heart problem. *See* Affidavit of Gerald A. Berge at ¶ 22. In July of 1992, Jackson complained of chest pains and spent four days in Fox Lake's Health Service Unit, but the progress notes of this episode reveal that the cause of the pains could not be determined. Most of the medical notes appear merely to reflect Jackson's demands and complaints. In their present form, these notes are merely hearsay. *See Romano v. Howarth,* 998 F.2d 101, 107–08 (2d Cir.1993). Therefore, Jackson cannot rely on these records to defeat the summary judgment motion. *See Walker v. Wayne County, Iowa,* 850 F.2d 433, 434–35 (8th Cir.1988), *cert. denied sub nom. Martin v. Walker,* 488 U.S. 1008, 109 S.Ct. 791, 102 L.Ed.2d 783 (1989).

It should also be noted that the only scintilla of evidence supporting the basic premise of Jackson's case—the allegation that his cellmate Jerome Cooper was smoking[4]—is Jackson's own uncorroborated assertion. The Defendants say that, after Jackson complained, they conducted an investigation and monitored his cell. Yet, they never found any evidence of smoking. *See* Affidavits of Kevin P. Goggins at ¶ 11; Gary McClelland at ¶ 6; Donald Cupery at ¶ 6; Robert Bensley at ¶ 6; Robert Prieve at ¶ 9; Jerome Martel at ¶ 6; Gerald A. Berge at ¶ 22.

Finally, Jackson has presented no evidence of the level of environmental tobacco smoke in his cell or whether that degree of exposure would have been sufficient to cause serious illness. Even if Jackson's roommate was smoking, the Plaintiff has failed to demonstrate a link between any level of environ-

mental tobacco smoke and any serious medical problem he was currently experiencing or was likely to experience in the future. Consequently, Jackson cannot satisfy the objective prong of the cruel and unusual punishment test.

■ As for the subjective component of the Eighth Amendment test, the Defendants argue that there is no evidence to support a finding that they acted with deliberate indifference. In response, Jackson points out that the Defendants refused to house him with a nonsmoking roommate even though a doctor had ordered that he be placed in a smoke-free cell. Soon after he arrived at Fox Lake, he began filing complaints alerting the Defendants that his "serious" medical conditions were being aggravated by smoke. Nevertheless, undisputed facts in the record show that—far from exhibiting a total unconcern for Jackson's welfare—the Defendants responded reasonably to all his complaints. They conducted an investigation and, even though no evidence of Cooper's smoking was found, they warned Cooper that he would be punished if he smoked in the cell. Moreover, every time Jackson complained of chest pains or breathing problems, he received medical care.

In assessing whether the smoky conditions of a prisoner's confinement offend the constitution, the Supreme Court has noted that the implementation and administration of a restrictive smoking policy "will bear heavily on the inquiry into deliberate indifference." *Helling v. McKinney,* —— U.S. at ——, 113 S.Ct. at 2482. In light of such action "it could be very difficult to demonstrate that prison authorities are ignoring the possible dangers posed by exposure to second hand smoke." *Id.*[5] "Public officials who act in spite of an unwelcome consequence of a decision do not 'intend' that consequence for constitutional purposes." *Steading,* 941 F.2d at 500.

---

4. Contrary to the allegation in his Complaint, Jackson had not been exposed to his cellmate's alleged smoking for eight months when he filed this lawsuit. Jackson was transferred to Fox Lake and housed with Cooper on June 12, 1992. He filed his first administrative complaint seeking a room change because of smoke on June 16, 1992, and filed this case on August 6, 1992.

5. In a similar vein, the Seventh Circuit warned a prisoner that it would be next to impossible to prove his second-hand smoke claim because prison officials who allow inmates to smoke "could not plausibly be accused of reaching this decision because they hope the smoke will injure other prisoners." *Steading v. Thompson,* 941 F.2d at 500.

In this case, the Defendants explain that they assigned Jackson to a cell and cellmate pursuant to a policy promulgated on March 31, 1992, which was necessitated by emergency overcrowding. Under this policy, prisoners were to be housed in double rooms. FLCI would attempt to house nonsmokers together, but if population demands and security considerations resulted in a nonsmoker being housed with a smoker, the cell would be designated as a nonsmoking cell and the smoker would have to smoke in another area. The smoker was to be notified of the ban and the ban would be enforced with punishment. Smoking was not totally forbidden at FLCI because the policymakers concluded that it helped some inmates relieve tension and because a ban could result in an underground market in contraband and associated abuses.

Rather than transfer Jackson to another cell, the Defendants attempted to enforce the smoking ban already in place. Jackson does not agree with this decision. He would rather have a cellmate of his choice or a single cell. However, refusal to meet Jackson's demands does not constitute deliberate indifference in this case, especially where it is undisputed that the Defendants attempted to eliminate smoke in addition to addressing Jackson's health complaints. In this context, none of Jackson's evidence supports the subjective prong of the Eighth Amendment test. Consequently, because the Plaintiff has failed to meet his burden of demonstrating that there are any genuine issues of material fact requiring a trial, the court will grant the Defendants' motion.

## ORDER

For these reasons the court ORDERS that the "Defendants' Motion for Summary Judgment Rule 56, Fed.R.Civ.P." (filed July 30, 1993, and as rebriefed) IS GRANTED.

IT IS FURTHER ORDERED that this action is dismissed with prejudice and upon its merits.

IT IS FURTHER ORDERED that, pursuant to Federal Rule of Civil Procedure 58, the Clerk of Court shall enter a final judgment as a separate document. This judgment shall provide that:

This action came on for hearing before the court, Honorable Thomas J. Curran, District Judge, presiding, and the issues having been duly heard and a decision having been duly rendered,

IT IS ORDERED AND ADJUDGED

that Plaintiff Pearlie B. Jackson take nothing, and that this action brought against Defendants Warden Berge, Captain Prieve, Major McClelland, Sergeant Goggins, Sergeant Martel, Sergeant Bensley, and Sergeant Cupery in their official and personal capacities is dismissed with prejudice and upon its merits.

Done and Ordered.